RUSS, AUGUST & KABAT
Marc A. Fenster, SBN 181067
mfenster@raklaw.com
Ben Wang, SBN 228712
bwang@raklaw.com
Andrew D. Weiss, SBN 232974
aweiss@raklaw.com
12424 Wilshire Boulevard, Twelfth Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-6991

Attorneys for Plaintiff
SPEX TECHNOLOGIES, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| SPEX TECHNOLOGIES, INC., | Case No. 8:16-CV-01790-JVS-AGR |
| Plaintiff, | |
| v. | **PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** |
| KINGSTON TECHNOLOGY CORPORATION, KINGSTON DIGITAL, INC., KINGSTON TECHNOLOGY COMPANY, INC., IMATION CORPORATION, DATALOCKER INC., DATA LOCKER INTERNATIONAL, LLC, | |
| Defendants. | |

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

| | |
|---|---|
| SPEX TECHNOLOGIES, INC., | Case No. 8:16-CV-01799-JVS-AGR |
| Plaintiff, | |
| v. | |
| WESTERN DIGITAL CORPORATION, WESTERN DIGITAL TECHNOLOGIES, INC., HGST, INC., | |
| Defendants. | |
| SPEX TECHNOLOGIES, INC., | Case No. 8:16-CV-01800-JVS-AGR |
| Plaintiff, | |
| v. | |
| TOSHIBA AMERICA ELECTRONICS COMPONENTS INC., TOSHIBA AMERICA INFORMATION SYSTEMS, INC., TOSHIBA AMERICA, INC., AND TOSHIBA CORPORATION, | |
| Defendants. | |
| SPEX TECHNOLOGIES, INC., | Case No. 2:16-CV-07349-JVS-AGR |
| Plaintiff, | |
| v. | |
| APRICORN, INC., | |
| Defendant. | |

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.      INTRODUCTION. ......................................................................... 1

II.     BACKGROUND. ........................................................................... 1

III.    CLAIM CONSTRUCTION PRINCIPLES. ................................... 2

IV.     ARGUMENT:  SPEX'S PROPOSED CONSTRUCTIONS ARE
        CONSISTENT WITH APPLICABLE PRINCIPALS AND LAW. .............. 3

        A.      "Defined Interaction" And "Interaction With A Host Computing
                Device In A Defined Way." .................................................. 3

        B.      "Peripheral Device." .......................................................... 6

        C.      "Security Means For Enabling One Or More Security
                Operations To Be Performed On Data"/"Means For
                Performing The One Or More Security Operations" ......................... 8

        D.      "Security Module That Is Adapted To Enable One Or More Security
                Operations To Be Performed On Data." ................................... 10

        E.      "Target Module That Is Adapted To Enable A Defined Interaction
                With The Host Computing Device." ........................................ 12

        F.      "Target Module Is Adapted To Enable Communication With The
                Security Module And Prevent Direct Communication
                With The Host Computing Device." ....................................... 13

        G.      "Means For Enabling Communication With A Host Computing
                Device" ........................................................................ 15

        H.      "Operably Connecting The Security Module And/Or The Target
                Module To The Host Computing Device In Response To
                [An / The] Instruction From The Host Computing Device." ............. 17

        I.      "Means For Operably Connecting The Security Means
                And/Or The Target Means To The Host Computing Device In
                Response To An Instruction From The Host Computing Device."...... 18

        J.      "Means For Mediating Communication Of Data Between The Host
                Computing Device And The Target Means So That The
                Communicated Data Must First Pass Through
                The Security Means." ......................................................... 19

RUSS, AUGUST & KABAT

170713 SPEX Opening Claim Construction Brief.docx

i

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION
BRIEF**

K.    "Means For Providing To A Host Computing Device, In Response To A Request From The Host Computing Device For Information Regarding The Type Of The Peripheral Device, Information Regarding The Function Of The Target Means" ..................................... 22

L.    "Providing To The Host Computing Device, In Response To The Request, Information Regarding The Type Of The Defined Interaction" ..................................... 23

M.    "Providing The Type Of The Target Module To The Host Computing Device In Response To The Request" ............. 24

N.    "Modular Device" ..................................... 25

V.    CONCLUSION. ..................................... 25

RUSS, AUGUST & KABAT

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF AUTHORITIES

**Cases**

*Aristocrat Techs. Australia PTY Ltd. V. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008) ........................................................ 21

*Biomedino, LLC v. Waters Techs. Corp.*,
  490 F.3d 946 (Fed. Cir. 2007) ............................................................ 3

*Dow Chem. Corp. v. NOVA Chems. Corp. (Can.)*,
  809 F.3d 1223 (Fed. Cir. 2015) ........................................................... 5

*Epistar Corp. v. ITC*,
  566 F.3d 1321 (Fed. Cir. 2009) ........................................... 2, 17, 19, 24

*Harari v. Lee*,
  656 F.3d 1331 (Fed. Cir. 2011) ........................................................... 2

*Linear Tech. Corp. v. Impala Linear Corp.*,
  379 F.3d 1311 (Fed. Cir. 2004) ..................................................... 12, 13

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) .............................................................. 2

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003) ........................................................... 3

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
  244 F.3d 1365 (Fed. Cir. 2001) ........................................................... 2

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S.Ct. 2120 (2014) ....................................................................... 5

*One-E-Way, Inc. v. ITC*,
  No. 2016-2105, 2017 WL 2509382 (Fed. Cir. Jun. 12, 2017) ..................... 6

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ........................................................... 2

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) ..................................................... 7, 17

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ...................................................... 3, 11

**Statutes**

35 U.S.C. § 112(6) ....................................................................... passim

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

## I.   INTRODUCTION.

SPEX is asserting that Defendants infringe two patents:  U.S. Patent No. 6,088,802 (the "'802 patent") and U.S. Patent No. 6,003,135 (the "'135 patent") (collectively, the "patents-in-suit").  The patents-in-suit are attached to this brief as Exhibits 1 and 2 of the Declaration of Andrew D. Weiss in support of this brief ("Weiss Decl.").  The patents-in-suit claim technology that improves on existing technology to allow for in-line hardware cryptographic functionality to be contained entirely within a peripheral or modular device.

Despite the plain and straight-forward language used in the asserted claims of the patents-in-suit, and the extensive description of the invention in the specifications, the parties have only been able to agree on a limited number of proposed constructions.  A large number of disputes remain, including whether multiple terms are indefinite and whether limitations should be imported into otherwise clear limitations.  For the reasons discussed in detail below, the Court should adopt SPEX's proposed constructions and reject Defendants' improper proposals.

## II.   BACKGROUND.

SPEX was formed to facilitate licensing of the technology developed and practiced by Spyrus, Inc. ("Spyrus").  Spyrus, founded in 1992, is a pioneering encryption company that, among other things, develops cryptographic products that are used in both the public and private sectors to secure sensitive information.  Around 1996 or 1997, Spyrus began to expand on its then-existing highly regarded cryptographic technology.  Spyrus developed the Hydra series of products, which added capabilities such as data storage and modem functionalities to Spyrus' existing technology.  Spyrus continues to sell products like the PocketVault P-3X that are based on its Hydra technology.  The inventions claimed in the patents-in-suit were created during the development of the initial Hydra products.

Like Spyrus, Defendants design, manufacture and sell hardware encrypting

RUSS, AUGUST & KABAT

170713 SPEX Opening Claim Construction Brief.docx

1

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

hardware data storage devices. SPEX alleges that Defendants' hardware-encrypting storage products infringe claims 1, 2, 6, 7, 11, 12, 23, 25, 38 and 39 of the '802 patent and claims 55 through 58 of the '135 patent. Both of the patents-in-suit were filed on the same day and contain similar specifications. Each patent incorporates the other by reference. '802 patent at 1:6-13, '135 patent at 6-13. Accordingly, for clam construction purposes, both patents effectively have the same specification consisting of both the '802 and '135 specifications. *See Harari v. Lee*, 656 F.3d 1331, 1334-37 (Fed. Cir. 2011) (holding that disclosure incorporated by reference could be used to overcome a written description rejection).

## III.  CLAIM CONSTRUCTION PRINCIPLES.

Interpreting the proper meaning and scope of a patent claim is a question of law exclusively for the Court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995). SPEX believes the Court is familiar with the general doctrines of claim construction. For the purposes of this brief, however, SPEX emphasizes two important points. First, it is important to emphasize that, where a term is used in accordance with its plain meaning, the Court should not re-characterize it using different language. *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001). Second, it is important to emphasize that there is "a heavy presumption that claim terms carry their full ordinary and customary meaning" unless Defendants can show clear and unambiguous disclaimer or a lexicographic definition by the inventors. *E.g.*, *Epistar Corp. v. ITC*, 566 F.3d 1321, 1334 (Fed. Cir. 2009); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) ("our cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.").

2

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

RUSS, AUGUST & KABAT

Many of the issues raised in this Brief are related to means-plus-function claims.  If a claim recites the word "means," there is a presumption that 35 U.S.C. § 112(6) ("§ 112(6)") applies.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en banc).  Conversely if the claim does not recite the word "means," there is a presumption that § 112(6) does not apply.  *Id.*  "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a ***sufficiently*** definite meaning as the name for structure."  *Id.* at 1349 (emphasis added).

If § 112(6) applies, the analysis has two steps:  "1) the court must first identify the function of the limitation; and 2) the court must then look to the specification and identify the corresponding structure for that function."  *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007) (citing *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1212 (Fed. Cir. 2003)).  The specification must "clearly link or associate structure with the claimed function…."  *Med. Instrumentation*, 344 F.3d at 1211.

## IV.  ARGUMENT:  SPEX'S PROPOSED CONSTRUCTIONS ARE CONSISTENT WITH APPLICABLE PRINCIPALS AND LAW.

### A.  "Defined Interaction" And "Interaction With A Host Computing Device In A Defined Way."[1]

| SPEX's Proposal | Defendants' Proposal |
|---|---|
| **Proposal for "defined interaction":** a specific, predefined functionality of the device, such as data storage, data communication, data input and output or user identification<br><br>**Proposal for "interaction with a host computing device in a defined way":** interaction with a host computing device using a specific, predefined | **Proposal for "defined interaction" and "interaction… in a defined way":** Indefinite under 35 U.S.C. § 112. |

---

[1] These phrases are used in asserted claims 1, 6, 11, 23, 25, 38 and 39 of the '802 patent, and claims 55, 57 and 58 of the '135 patent.  The parties agree that they have the same construction.

3

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

| functionality of the device, such as data storage, data communication, data input and output or user identification | |
|---|---|

Although SPEX's proposed constructions are slightly different due to grammatical differences of the phrases to be construed,[2] SPEX proposes to construe these terms consistently as referring to a specific, predefined functionality of the device, consistent with the plain language and intrinsic evidence. The claims describe a defined interaction as functionality enabled by the target means. *E.g.*, '802 patent claim 11 ("target means for enabling a defined interaction with a host computing device"). The Abstract of the '802 patent teaches that "[t]he defined interaction can provide a variety of types of functionality (e.g., data storage, data communication, data input and output, user identification)." The specification similarly teaches that the "defined interactions can provide a variety of types of functionality (e.g., data storage, data communication, data input and output, user identification), as described further below." '802 patent at 3:33-36; *see also* '135 patent at 4:18-31 ("The target module is adapted to enable a defined interaction with a host computing device (examples of which are given below)"; describing data storage, data communication, data input and output and user identification); '802 patent at 4:62-5:4 (describing the defined interactions of the target functionality); 13:27-15:41 (same with additional detail).[3] The file history does not alter the teachings of the other intrinsic evidence. Thus, the intrinsic

---

[2] Defendants may raise concerns that SPEX's proposed constructions are not identical and mean different things. SPEX does not intend to propose different meanings for the terms. If the Court is concerned that the constructions mean different things, SPEX proposes both terms be construed as "a specific, predefined functionality of the device, such as data storage, data communication, data input and output or user identification."

[3] These terms would be definite to a layperson, let alone a person of ordinary skill in the art. The plain meaning of the term means an interaction that is defined. Particularly in light of the examples in the specification, a layperson would understand what these terms mean.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

Russ, August & Kabat

RUSS, AUGUST & KABAT

evidence is consistent with the plain meaning of "defined interaction" as something that is a specific, predefined functionality of the target means, such as data storage or data communications. *See also* Gomez Decl.[4] at ¶¶ 35-43. "Interaction with a host computing device in a defined way" has the same meaning.

Defendants contend that this term is indefinite. "[A] patent is invalid for indefiniteness [only] if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014). "The burden of proving indefiniteness remains on the party challenging validity which must be establish[ed] by clear and convincing evidence." *Dow Chem. Corp. v. NOVA Chems. Corp. (Can.)*, 809 F.3d 1223, 1227 (Fed. Cir. 2015) (Moore, J., concurring). For the reasons discussed above, the intrinsic evidence informs a person of ordinary skill in the art of the scope of this term. *E.g.*, Gomez Decl. at ¶¶ 35-46. Indeed, until it became legally expedient to alter its position, the Kingston defendants apparently understood these terms sufficiently to file petitions for *inter partes* reviews. *E.g.*, Weiss Decl. Ex. 3 at 29-30 ("The '802 patent explains that this defined interaction can include storing data, and that the structure that performs this function includes memory"); *see also, e.g.*, Weiss Decl. Ex. 3 at 57-58; Weiss Decl. Ex. 4 at 24 (the defined interaction in the prior art "is the exchange of data between the host and the target module (memory)"), 26 (similar statement); Weiss Decl. Ex. 5 at 26, 27 (similar statements).[5] In any event, Defendants'

---

[4] "Gomez Decl." refers to the Declaration of Mr. Miguel Gomez Regarding Claim Construction, filed concurrently.

[5] *Inter partes* review cannot address indefinite claims. Despite their apparent change of position with respect to this term, as well as the allegedly indefinite means-plus-function terms discussed below, the Kingston defendants have not withdrawn their petitions.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

primary argument appears to be that the phrase cannot be understood because the patents do not describe the meaning of an "undefined" interaction or how a defined interaction is different from an interaction.  "Undefined interaction," however, is not a claim term.  "Interaction," distinct from "defined interaction," is also not a claim term.  These unused terms should not impact the indefiniteness analysis. *See, e.g.*, *One-E-Way, Inc. v. ITC*, No. 2016-2105, 2017 WL 2509382, at *6 (Fed. Cir. Jun. 12, 2017) (rejecting argument that that a claim term is indefinite because of a failure to identify how it differs in scope from an unasserted claim term). Further, Defendants' argument makes little sense because the meaning of a phrase is usually understood even if the meaning of the opposite phrase is not defined.

Accordingly, the Court should reject Defendants' indefiniteness proposal and should adopt the constructions proposed by SPEX.

### B.   "Peripheral Device."[6]

| SPEX's Proposal | Defendants' Proposal |
|---|---|
| Any device that operates outside of a host computing device (*i.e.*, the keyboard-computer-screen system) and that is connected to the host computing device.  Typical peripheral devices include but are not limited to a disk drive and a printer. | Any device that operates outside of a host computing device and that is connected to the host computing device. |

The intrinsic and extrinsic evidence supports SPEX's proposed construction. "Peripheral device" is used in the preamble of the claims of the '802 patent.  *E.g.*, '802 patent at claim 11.  The specification also uses "peripheral device" according to its ordinary meaning.  For example, the specification describes a "peripheral device" as a "device that operates outside of a host computing device and that is connected to the host computing device."  '802 patent at 4:52-55.  A host computing device is described as the monitor, keyboard, CPU and RAM

---

[6] This phrase is used in asserted claims 1, 2, 6, 7, 11, 12, 25 and 25 of the '802 patent.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

RUSS, AUGUST & KABAT

combination.  '802 patent at 6:23-33, Fig. 6; *see also* Gomez Decl. at ¶ 49.[7]  The description of "peripheral device" in the specification is consistent with the plain and ordinary meaning of the term in 1997, when the '802 patent was filed.  Weiss Decl. Ex. 6 (peripheral:  "a device that is ***not part of the keyboard-computer-screen system***, but is connected to it separately and can exchange signals with it.  ***Typical peripherals are a disk drive***, a printer…" (emphasis added)); Ex. 7 ("In computing, a device, ***such as a disk drive***, printer, modem, or joystick, that is connected to a computer and is controlled by the computer's microprocessor." (emphasis added)); Gomez Decl. at ¶ 48.  The file history does not alter the plain and ordinary meaning.  SPEX's proposed construction should therefore be adopted.

The primary dispute here is Defendants' interpretation of their construction.  Defendants argue that "peripheral device" excludes hard drives within a computer case.  The plain meaning of "peripheral device" would not exclude hard drives within a computer case.  Weiss Decl. Exs. 6, 7; Gomez Decl. at ¶ 48.  Because Defendants are proposing to narrow the ordinary meaning of the term, Defendants must show clear and unambiguous evidence that the inventors intended to limit the scope of "peripheral device."  *E.g., Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).  Defendants cannot meet this burden.  The only basis disclosed by Defendants during the meet and confer process for their position is the following statement:   "The peripheral device driver can have previously been installed on a data storage device (e.g., hard disk) of the host computing device (in. FIG. 6, the peripheral device driver is shown stored in the memory section 606b of the memory device 606 of the host computing device 601)."  '802 patent at 9:5-9.  This statement does not clearly and unambiguously disclaim the ordinary meaning

---

[7] After Mr. Gomez rendered his opinion, SPEX amended its construction to better highlight the dispute among the parties.  SPEX's amendment does not change the meaning of SPEX's proposed construction and does not alter the opinions rendered by Mr. Gomez.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

of "peripheral device."  It notes that a driver can be stored on a hard disk but notes that the driver is stored in memory section 606b in the preferred embodiment.  The statement does **not** clearly and unambiguously disclose that memory section 606b (or memory device 606) is a hard drive.  Unrebutted testimony from expert Miguel Gomez further shows that Defendants' argument is inconsistent with the understanding of one of ordinary skill in the art at the time.  Gomez Decl. at ¶¶ 50. Additionally, other intrinsic evidence suggests that the "peripheral device" includes internal disk drives, such as the reference to using SCSI and IDE interfaces (which are protocols used exclusively by devices internal to a computer case).  '802 patent at 5:46-49.

Accordingly, the Court should adopt SPEX's proposed construction.

C.    **"Security Means For Enabling One Or More Security Operations To Be Performed On Data"/"Means For Performing The One Or More Security Operations"[8]**

| SPEX's Proposal | Defendants' Proposal |
|---|---|
| Subject to 35 U.S.C. § 112(6) | Governed by 35 U.S.C. § 112(6). |
| Recited function:  enabling one or more security operations to be performed on data  (claims  1,  6,  11,  23,  25); performing  the  one  or  more  security operations (claim 39) | Recited Functions: (1) enabling security operations to be performed on data; (2) performing the security operations; |
| Corresponding Structures:<br>1.  Cryptographic processing device 801 (processor capable of performing the cryptographic operations, as described at '802 patent, 15:63-15:67);<br>2.  Security token (device that performs security operations and that includes one or more mechanisms (such as, for example, use of a hardware random number generator and/or protected memory) to provide | Corresponding Structures:<br>1.  A specific hardware component programmed or configured to perform a security operation disclosed at 18:1-47 of the '802 Patent or 21:29 – 22:9 of the '135 Patent.<br>2.  A special purpose embedded processor, embodied on a single integrated chip and designated as MYK-82 (and also referred to by the name Capstone), which includes an ARM6™ processor core and several special purpose cryptographic processing |

---

[8] These phrases are used in asserted claims 1, 6, 11, 23, 25 and 39 of the '802 patent.  The parties agree that they have the same construction.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

RUSS, AUGUST & KABAT

| | |
|---|---|
| security for the content of those operations as described at '802 patent at 5:35-39); | elements that have been developed by the Department of Defense. |
| 3. A specific hardware component programmed or configured to perform a security operation disclosed at 18:1-47 of the '802 Patent or 21:29 – 22:9 of the '135 Patent; | |
| 4. A special purpose embedded processor, embodied on a single integrated chip and designated as MYK-82 (and referred to by the name Capstone), which includes an ARM6™ processor core and several special purpose cryptographic processing elements that have been developed by the Department of Defense ('802 patent at 15:67-16:8); or | |
| 5. Equivalents thereof. | |
| If an algorithm is necessary for any corresponding structures, SPEX identifies one or more of the security operations disclosed at '802 patent, 18:1-47. | |

The parties agree that these phrases are means-plus-function phrases. Though the parties have proposed different recited functions, SPEX's recited functions track the claim language directly. The specification discloses multiple structures that are clearly linked to the recited function of enabling/performing security operations.

The parties agree that the specification discloses the structures identified by Defendants as corresponding structures – the specific hardware component and the special purpose processor (structures 3 and 4 in SPEX's proposed construction).

The specification discloses two additional corresponding structures. First, the specification discloses a cryptographic processing device 801 and explicitly links it to the recited function of performing security functions:

The cryptographic processing device 801 can be adapted to perform security operations. Generally, the cryptographic processing device 801 can be embodied by any processor capable of performing the cryptographic

9

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

operations desired to be provided by the peripheral device.

'802 patent at 15:63-67.  The cryptographic processing device 801 is clearly linked to the recited function.  *Id.* at 15:63-64 ("The cryptographic processing device 801 can be adapted to perform security operations").  Thus, the security means element should be construed to include the cryptographic processing device 801 as a corresponding structure.

Second, the specification discloses a security token and explicitly links it to the recited function:

> The security mechanism 302a can be, for example, embodied as a security token.  Herein, "security token" refers to a device that performs security operations and that includes one or more mechanisms (such as, for example, use of a hardware random number generator and/or protected memory) to provide security for the content of those operations.

'802 patent at 5:33-39.  A security token is a special purpose device:  "a device that performs security operations and that includes one or more mechanisms (such as, for example, use of a hardware random number generator and/or protected memory) to provide security for the content of those operations."  *Id.* at 5:34-39. The security token is clearly linked to the recited function of performing security functions.  *E.g.*, *id.* at 5:22-28 ("Generally, the security mechanism 302a can be configured to perform any electronic data security operation (herein, referred to simply as 'security operation')"; a security token is an example of "security mechanism 302a").  It is therefore properly included as a corresponding structure.

Accordingly, the Court should construe security means to include the corresponding structures proposed by SPEX.

**D.      "Security Module That Is Adapted To Enable One Or One Security Operations To Be Performed On Data."[9]**

---

[9] This phrase is used in asserted claims 55, 57 and 58 of the '135 patent.

| SPEX's Proposal | Defendants' Proposal |
|---|---|
| This is not subject to 35 U.S.C. § 112(6).<br><br>If this phrase is subject to 35 U.S.C. § 112(6):<br><br>Recited function:  enabling one or more security operations to be performed on data<br><br>Corresponding Structures:  See corresponding structure provided above for "security means for enabling one or more security operations to be performed on data" and "means for performing the one or more security operations." | Governed by 35 U.S.C. § 112(6).<br><br>Recited function:  enable security operations to be performed on data<br><br>Corresponding Structure:  See corresponding structure provided above for "security means for enabling one or more security operations to be performed on data" and "means for performing the one or more security operations." |

Defendants' argue that this phrase invokes § 112(6).  SPEX disagrees.  In order to overcome the presumption against the application of § 112(6), Defendants must show that the "security module" phrase does not sufficiently disclose a structure.  *Williamson*, 792 F.3d at 1349.  Defendants cannot meet this burden here.  "Module" in the claims of the '135 patent refers to a specific hardware component of the claimed "modular device."  *E.g.*, '135 patent claim 55 ("the **modular device** comprising a **security module**" (emphasis added)).  Although the construction of modular device is disputed, both parties agree that a modular device is a hardware device.  *See* Section IV.N, *infra*.  The specification further describes the security module as a hardware component of the modular device.  *E.g.*, '135 patent at 7:41-45 ("The security module 401 and target module 402 are **physically** separate devices…" (emphasis added)); 8:62-9:1 (describing the security module as a combination of hardware devices); 7:22-27 (teaching that the security module is hardware called a security token).  The use of "module," in this context, therefore refers to a hardware circuit rather than simply being used as a nonce word as it is used in other contexts.

SPEX's position is consistent with Federal Circuit law.  The Federal Circuit has consistently held that a circuit, to one of ordinary skill in the art, is a

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

RUSS, AUGUST & KABAT

combination of devices to perform a desired function.  A circuit is a sufficiently definite structure if the circuit is claimed with a specific function for that circuit. *See, e.g.*, *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) (relying on the understanding of a person of ordinary skill in the art of a circuit).  Here, the intrinsic evidence shows that "module" refers to a combination of hardware devices.  *E.g.*, '135 patent at 8:62-9:1.  Further, as evidenced by Defendants' acknowledgement that this language has a recited function, the phrase includes a specific function for the claimed "module."

Accordingly, consistent with the intrinsic evidence and the Federal Circuit's logic with respect to "circuit," this claim phrase includes sufficient structure to overcome Defendants' § 112(6) argument.  If the Court disagrees, the parties agree that the phrase should be consistent with the "security means" phrase above.

### E.    "Target Module That Is Adapted To Enable A Defined Interaction With The Host Computing Device."[10]

| SPEX's Proposal | Defendants' Proposal |
| --- | --- |
| This is not subject to 35 U.S.C. § 112(6).<br><br>If this phrase is subject to 35 U.S.C. § 112(6), the parties agree that the phrase should be given the same construction as "target means for enabling defined interactions…":<br><br>Recited Function:  enabling a defined interaction with a host computing device<br><br>Corresponding Structures:<br>  1.  A memory module adapted to enable non-volatile storage of data;<br>  2.  A communications module adapted to enable communications between the host computing device and a modem or LAN transceiver;<br>  3.  A smart card reader;<br>  4.  Biometric device; or | This is governed by 35 U.S.C. § 112(6).<br><br>Recited Function:  enabling a defined interaction with the host computing device<br><br>Structures:  For the "target means" or "target module", the structure is (1) a memory module adapted to enable non-volatile storage of data, (2) a communications module adapted to enable communications between the host computing device and a modem or LAN transceiver, (3) a smart card reader, or (4) biometric device.  The specification does not describe corresponding structure for "enabling a defined interaction with a host computing device."  Further, as previously mentioned, the term "defined interaction" is indefinite. |

---

[10] This phrase is used in asserted claims 55, 57 and 58 of the '135 patent.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

| 5. Equivalents thereof. | |

For the same reasons discussed above with respect to the "security module" phrase, the "target module" phrase connotes sufficient structure and does not invoke § 112(6). *See, e.g.*, *Linear Tech*, 379 F.3d at 1320. If the Court rules in favor of Defendants, the parties agree that it should be given the same agreed construction as the "target means for enabling defined interactions…" phrase. *E.g.*, *Kingston* case, D.I. 99 at 4 (recited the agreed construction for "target means…").

### F. "Target Module Is Adapted To Enable Communication With The Security Module And Prevent Direct Communication With The Host Computing Device."[11]

| SPEX's Proposal | Defendants' Proposal |
|---|---|
| This is not subject to 35 U.S.C. § 112(6).<br><br>If this phrase is subject to 35 U.S.C. § 112(6):<br><br>Recited function: enabling communication with the security module and preventing direct communication with the host computing device<br><br>Corresponding Structures: The target module as above configured so that the target module is connected to the security module to allow in-line security operations (as shown in Figures 4B, 6, 8 or 9A) and further comprising:<br>1. Pins and sockets;<br>2. Computer bus;<br>3. Input/output (I/O) device 618; or<br>4. Equivalents thereof. | Governed by 35 U.S.C. § 112(6) and indefinite for lack of sufficient corresponding structure.<br><br>Recited Function: enabling communication with the security module and preventing direct communication with the host computing device<br><br>Corresponding Structure: none. The patent's disclosure is insufficient because it does not disclose adapting the target module to "prevent direct communication with the host computing device" and likewise fails to disclose structure corresponding to such a functionality. |

This phrase is not subject to § 112(6) because "module" is not used as a nonce word, for the same reasons described above. If the phrase is subject to § 112(6), the parties do not dispute the recited function of "enabling communication

---

[11] This phrase is used in asserted claim 56 of the '135 patent.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

with the security module and preventing direct communication with the host computing device."  The recited function is from the perspective of the target module.

With respect to the recited function of preventing *direct* communications between the target module and host computing device, the corresponding structure is the target module being connected to the security module instead of the host computing device to allow what the patent describes as "in-line" security operations.  This is shown, for example, in Figure 4B of the '135 patent.  In Figure 4B, second module 412 (the target module) is connected to the first module 411 (the security module).  '135 patent at 8:29-31 ("it is preferable that the first module 411 be the security module and the second module 412 be the target module to facilitate implementation of the in-line security aspect of the invention").  The target module is *not* directly connected to, and cannot directly communicate with, the host computing device.  Figures 6, 8 and 9A show embodiments with similar structural limitations.  '135 patent at 9:4-8 (describing Figure 6;  target module only includes an input/output device to communicate with the security module); 19:4-8 (describing Figure 8; "target module I/O interface 807 enables communications between the…security module 800 and a target module"); 20:18-36 (describing the path of data in Figure 9A from the host computing device to the security module and then the target module).  The disclosed design of the device is therefore the corresponding structure to the direct communication recited function.

The specification of the '135 patent describes three structures that are clearly linked to the function of enabling communication between the target and security modules.  First, the specification describes pins and sockets that "enable electrical communication between the modules."  135 patent at 8:12-16.  "Electrical communication" refers to communication between the target and security modules.  *Id.*; *see also* Fig. 4A (showing a block diagram with communication between the target and security modules).  Second, the specification discloses a computer bus

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

Russ, August & Kabat

being used to enable communication between the target and security modules. '135 patent at 9:8-11 (disclosing input/output devices to communicate between the target and security modules via a computer bus).  Third, the specification discloses input/output (I/O) device 618 to enable communicate between the target module and the security module:  "The target module 620 of the modular device includes…an input/output (I/O) device 618 for enabling communication with the security module 610." '135 patent at 9:6-7.

Accordingly, the Court should adopt the structures proposed by SPEX.

### G.    "Means For Enabling Communication With A Host Computing Device"[12]

| SPEX's Proposal | Defendants' Proposal |
|---|---|
| Subject to 35 U.S.C. § 112(6) | Governed by 35 U.S.C. § 112(6). |
| Recited Function: enabling communication with a host computing device | Recited Function: enabling communication with a host computing device |
| Corresponding structures:<br>1.  **Input/Output (I/O) device**;<br>2.  PCMCIA interface;<br>3.  **Cord between housing and matching receptacle**;<br>4.  Wireless communication interface;<br>5.  Smart card interface;<br>6.  **Serial interface** (such as RS-232);<br>7.  **Parallel interface**;<br>8.  SCSI interface;<br>9.  IDE interface; or<br>10.  Equivalents thereof. | Corresponding Structure: a wireless communications interface, a PCMCIA interface, a smart card interface, a serial RS-232 interface, a SCSI interface, or an IDE interface |

The parties agree as to the recited function for this phrase as well as some of the corresponding structures (the disputed structures are shown in bold in SPEX's proposed construction).  SPEX's proposed structures should also be adopted because each of them is clearly linked to the recited function of enabling communication between a peripheral device and a host communication device.

---

[12] This phrase is used in asserted claims 1, 6, 11, 23 and 25 of the '802 patent.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

Figure 3A of the '802 patent, in the two-way arrow described in the specification as "communications interface 303," shows communication between the peripheral device and the host computing device.   '802 patent at Fig. 3A, 5:5.   The specification discloses that communications interface 303 could be "any of a variety of communication interfaces, such as a wireless communications interface, a PCMCIA interface, a smart card interface, a serial interface (such as an RS-232 interface), a parallel interface, a SCSI interface or an IDE interface." *Id.* at 5:6-10. While Defendants adopt some of the recited structures (such as "wireless communications interface"), Defendants do not adopt the disclosed structures of "parallel interface" or "serial interface."  There is no reason to include some of the disclosed embodiments for the communications interface, while excluding others. These structures (SPEX's proposed structures 6 and 7) are clearly linked in the specification to the recited function, as shown in Figure 3A.  They should therefore be included in the construction as proposed by SPEX.

SPEX's proposed structures of "input/output device" and "cord" should also be included as corresponding structures because they are also explicitly linked to the recited function for this phrase.   The specification teaches that a peripheral device includes "an input/output (I/O) device 613 for enabling communication with the host computing device 601."   '802 patent at 6:37-40.   The disclosed input/output device is a conventional device. *Id.* at 6:40-43.   Because the specification describes the input/output device as enabling communication, it is clearly linked to the recited function.   The "cord" structure is similarly clearly linked.  In the paragraph found at 6:52-7:10 of the '802 patent, the specification teaches (again) that the peripheral device can be connected to the host computing device using the agreed structures of PCMCIA or wireless communication.   The paragraph also discloses that the peripheral device can be connected using "a cord" that includes "a plug…being inserted into a mating receptacle formed in the host computing device."   '802 patent at 7:2-5.   SPEX's proposed "cord" structure is

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

therefore clearly linked to the recited function and should be included in the construction.

For the foregoing reasons, the Court should adopt the broader proposed construction proposed by SPEX.

**H.    "Operably Connecting The Security Module And/Or The Target Module To The Host Computing Device In Response To [An / The] Instruction From The Host Computing Device."[13]**

| SPEX's Proposal | Defendants' Proposal |
|---|---|
| No construction necessary | Operably connecting to the host computing device **by selecting from three modes—a security module only mode, a target module mode, and a combined security and target module mode—**in response to [an /the] instruction from the host computing device. |

SPEX proposes to give this phrase its plain and ordinary meaning. SPEX's proposal is consistent with the intrinsic evidence. The claims do not alter the meaning of this phrase. *E.g.*, claims 55, 57 and 58 of the '135 patent. The specification and file history similarly do not assign special meaning to this phrase. Defendants, however, propose to import the "three mode" limitation highlighted in the proposed construction table above.

Defendants fail to point to any clear and unambiguous disclaimers importing this limitation into the disputed claim language. In order to prevail, Defendants must show that the patent applicants "demonstrate[d] an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Epistar*, 566 F.3d at 1334 (quoting *Teleflex*, 299 F.3d at 1325). There is no clear disavowal in the intrinsic evidence. The "three mode" embodiment is discussed in the specification with reference to one embodiment of

---

[13] This phrase is used in asserted claims 55, 57 and 58 of the '135 patent.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

RUSS, AUGUST & KABAT

the invention shown in Figure 7 of the '135 patent. '135 patent at 9:26-27 ("FIG. 7 is a flow chart of a method 700, according to an embodiment of the invention,"); 6:29-31 ("FIG. 7 is a flow chart of a method, according to an embodiment of the invention…"). The specification describing the embodiment shown in Figure 7 similarly fails to include any clear and unambiguous disclaimers importing the "three mode" limitation into the disputed language. *See* '135 patent at 9:26-10:44. Defendants cannot therefore meet their burden of showing a clear disavowal of claim scope and Defendants' proposed construction must therefore be rejected.

I.     **"Means For Operably Connecting The Security Means And/Or The Target Means To The Host Computing Device In Response To An Instruction From The Host Computing Device."[14]**

| SPEX's Proposal | Defendants' Proposal |
|---|---|
| Subject to 35 U.S.C. § 112(6) | Governed by 35 U.S.C. § 112(6). |
| Recited Function: operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device | Recited Function: The function is "operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device." |
| Corresponding Structures: <br> 1. PCMCIA interface and memory section 612a; <br> 2. PCMCIA interface and a device or host driver; or <br> 3. equivalents thereof. | Corresponding Structure: The corresponding structure is a PCMCIA interface and a device or host driver for operably connecting to the host computing device **by selecting from three modes—a security means only mode, a target means only mode, and a combined security and target means mode**—in response to an instruction from the host computing device, and equivalents thereof. |

The parties agree as to the words of the recited function but disagree as to the meaning of the recited function. Similar to the "operably connecting…" term above, as evidenced by Defendants' corresponding structure, Defendants seek to import their "three mode" limitation into the recited function here. For the same

---

[14] This phrase is used in asserted claims 1 and 6 of the '802 patent.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

1  reasons as above, Defendants' imported limitation must be rejected.  *E.g.*, *Epistar*,

2  566 F.3d at 1334.

3  After removal of Defendants' improper limitation, the parties generally agree

4  that one of the corresponding structures is the PCMCIA interface and a device or

5  host driver (SPEX's second proposed corresponding structure).[15]  SPEX's other

6  proposed corresponding structure should also be adopted.  Just as with the first

7  proposed structure, the PCMCIA interface operably connects the security means

8  and/or target means to the host computing device.  *E.g.*, '802 patent at Fig. 3, 5:7-8.

9  The specification also teaches that the host computing device can access a known

10 memory section (labeled 612a in Figure 6) that provides data in response to a host

11 computing device's effort to identify the peripheral device.  '802 patent at 7:60-

12 8:14.  The combination of the PCMCIA interface and memory section 612a

13 therefore allows a peripheral device to operably connect to the host computing

14 device and this combination is clearly linked to the recited function.  Accordingly,

15 the Court should adopt SPEX's proposed construction.

16 **J.      "Means For Mediating Communication Of Data Between The**

17 **Host Computing Device And The Target Means So That The**

18 **Communicated Data Must First Pass Through The Security**

19 **Means."[16]**

| SPEX's Proposal | Defendants' Proposal |
|---|---|
| Subject to 35 U.S.C. § 112(6) | Governed by 35 U.S.C. § 112(6) and indefinite for lack of sufficient corresponding structure. |
| Recited Function:      mediating communication of data between the host computing device and the target means | Recited Function:   The function is |

_____

[15] The difference between SPEX's second proposed corresponding structure and Defendants' proposal, with the bolded, improper language removed, is simply a recitation of the recited function.  SPEX does not believe this recitation is necessary.

[16] This phrase is used in asserted claims 1, 11 and 23 of the '802 patent.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION
BRIEF**

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

| | |
|---|---|
| so that the communicated data must first pass through the security means<br><br>Corresponding Structures:<br>1. A field programmable gate array (FPGA). If an algorithm is necessary, the algorithm is (1) receiving data from host computing device; (2) depending on configuration settings, providing data to be to be processed by a cryptographic processor; and (3) transferring data to target means (see Fig. 9A, 16:58-17:7);<br>2. Interface control device 910 (as shown in Fig. 9B); or<br>3. Equivalents thereof. | "mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means."<br><br>Corresponding Structure: The patent fails to provide sufficient corresponding structure; the structure it discloses is a specific hardware component limited to:<br><br>(i) a field-programmable gate array programmed to perform the steps at 16:57 – 17:15 of the '802 Patent; or<br><br>(ii) a device with the elements shown or described in Figure 9B and 17:25-51 of the '802 Patent and programmed to control the flow of data between the host computing device and the target means so that the communicated data must first pass through the security means.<br><br>The patent's disclosure is insufficient, however, because it fails to disclose how the devices are configured or programmed to perform the recited function. |

The parties agree that this phrase is subject to § 112(6) and as to the recited function. The parties disagree, however, about whether the specification discloses corresponding structures.[17]

The specification of the '802 patent discloses sufficient structure that is clearly linked to either parties' proposed recited functions. First, the parties agree that the specification discloses a field programmable gate array ("FPGA") as a

---

[17] As discussed above with respect to the "defined interaction" terms, the Kingston defendants have represented to the PTAB that they believe this phrase is definite. *See* Weiss Decl. Ex. 3 at 35-36.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

corresponding structure. *See* '802 patent at 16:43-56 (teaching than an FPGA is used "to control the flow of data between the host computing device and the target device" to enable, for example, in-line cryptography). Second, the parties agree that an interface control device, shown in Figure 9B of the '802 patent, is a corresponding structure. Defendants also propose to include the unnecessary text at 17:25-51. Fig. 9B, however, "is a block diagram of a particular embodiment of an interface control device 910." '802 patent at 17:15-16. The interface control device is the device that performs the recited function of mediating communications. '802 patent at 16:52-56. Accordingly, Figure 9B, without the additional limitations described in Defendants' proposed text, is clearly linked to the recited function and is the appropriate corresponding structure.

Defendants have not provided a clear reason for their position. Defendants appear to argue that this term is indefinite because the specification does not disclose algorithms for either structure. Defendants' argument appears to assume that both an FPGA and Figure 9B are general purpose computers for which an algorithm is necessary. The Federal Circuit requires an algorithm be disclosed for general purpose computers because they "can be programmed to perform very different tasks in very different ways." *Aristocrat Techs. Australia PTY Ltd. V. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Unlike the general purpose computer in *Aristocrat*, neither structure proposed here can be "programmed to perform very different tasks in very different ways." *See id.* As the unrebutted expert evidence shows, an FPGA is a low-level device whose functionality is dependent on the environment in which it is integrated. Gomez Decl. at ¶ 61. For example, in Figure 8 of the '802 patent, the potential functionality of the FPGA is limited as a result of its functional placement between the host computing device and security and target functionalities. *Id.* Even though it is reprogrammable, an FPGA cannot "perform very different tasks in very different ways" like a processor or PC. *Id.* at ¶¶ 59-61. The interface control

RUSS, AUGUST & KABAT

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

device shown in Figure 9B is also not a general purpose computer.  Figure 9B is a circuit that is not programmable.  *Id.* at ¶ 57.  It is not equivalent to a general purpose computer under *Aristocrat*.

If the Court finds that an algorithm is necessary, the specification discloses an algorithm clearly linked to the recited function.  Gomez Decl. at ¶¶ 62-63; '802 patent at Fig. 9A, 16:58-17:7.  The recited function shows how the mediating device (*e.g.*, the FPGA) is programmed to mediate (*e.g.*, control) the flow of data between the host computing device and the target means so that data passes through the security device.  *Id.*  Defendants even admit that the FPGA is "programmed" to perform these steps.  Defendants have provided no explanation as why an FPGA programmed with the algorithm disclosed in the specification is not sufficient to accomplish the recited function.

Accordingly, the Court should adopt SPEX's proposed construction.

**K.    "Means For Providing To A Host Computing Device, In Response To A Request From The Host Computing Device For Information Regarding The Type Of The Peripheral Device, Information Regarding The Function Of The Target Means"[18]**

| SPEX's Proposal | Defendants' Proposal |
| --- | --- |
|  |  |

---

[18] This phrase is used in asserted claim 6 of the '802 patent.  It is also used in claim 25 (through its dependence on claim 24) but claim 25 refers to "target" instead of "target means."  This discrepancy is reflected in SPEX's recited function but does not alter the analysis.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

RUSS, AUGUST & KABAT

| | |
|---|---|
| Subject to 35 U.S.C. § 112(6)<br><br>Recited Function:  providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target [means]<br><br>Corresponding Structures:<br>1.   Memory section 612a; or<br>2.   Equivalents thereof. | Governed by 35 U.S.C. § 112(6) and indefinite for lack of sufficient corresponding structure.<br><br>Recited Function:  The function is "providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means."<br><br>Corresponding Structure:  none.  The patent's disclosure is insufficient because it fails to disclose sufficient structure for providing information about a "target means" in response to a request for information about a "peripheral." |

The parties agree on the recited function for this means-plus-function phrase.[19]  The specification discloses memory section 612a as being clearly linked to the agreed recited function.  The specification describes how information identifying the target functionality of the device is provided in a known memory section (labeled 612a) and is provided to the host computing device when it seeks information identifying the peripheral device.   '802 patent at 7:60-8:14.  Unrebutted expert evidence supports SPEX's proposed construction.  Gomez Decl. ¶¶ 68-70.  Defendants have provided no explanation or evidence to support their position.  Accordingly, the Court should adopt SPEX's proposed construction.

### L.    "Providing To The Host Computing Device, In Response To The Request, Information Regarding The Type Of The Defined Interaction"[20]

| SPEX's Proposal | Defendants' Proposal |
|---|---|
| | |

---

[19] In their PTAB petition, the *Kingston* defendants took the position that this phrase was definite.  Weiss Decl. Ex. 3 at 42.

[20] This phrase is used in asserted claim 38 of the '802 patent.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

| | |
|---|---|
| No construction necessary | In response to the request for one type of information (i.e., information regarding the type of the peripheral device), providing to the host computing device different information (i.e., information about the type of defined interaction).<br><br>As previously indicated, however, the term "defined interaction" is indefinite, thus rendering this term indefinite. |

This phrase needs no construction because it has a plain meaning. *See, e.g.,* '802 patent at 7:17-40 (describing a host device driver asking for information about the connected device and the device responding with the identification of the target functionality). The claims, specification and file history do not alter then plain and ordinary meaning of this phrase. Defendants, however, seek to rewrite this claim phrase without reason. Defendants' unnecessary redrafting of the claim introduces the limitation that the information requested must be different than the provided information. No clear and unambiguous disclaimer supports Defendants' proposal. *See, e.g., Epistar*, 566 F.3d at 1334. Accordingly, the Court must reject Defendants' proposed construction.

**M.** **"Providing The Type Of The Target Module To The Host Computing Device In Response To The Request"[21]**

| SPEX's Proposal | Defendants' Proposal |
|---|---|
| No construction necessary | In response to the request for one type of information (i.e., information regarding the type of the modular device), providing different information (i.e., information about the type of target module). |

Defendants propose to import the same "different information" limitation in this phase as they did in the previous "providing" phrase. Just as in the previous phrase, no clear and unambiguous disclaimer supports Defendants' proposed limitation. *See, e.g., Epistar*, 566 F.3d at 1334. The Court should therefore reject

---

[21] This phrase is used in asserted claim 55 of the '135 patent.

24

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

Russ, August & Kabat

Defendants' imported limitations.

### N.    "Modular Device"[22]

| SPEX's Proposal | Defendants' Proposal |
| --- | --- |
| Plain and ordinary meaning.  The plain and ordinary meaning is:  "physically separate devices that can be physically and electronically joined " | A device that operates outside of a host computing device and that is connected to the host computing device |

The Court should adopt the plain and ordinary meaning of modular device. The claims use the term in an ordinary manner.  *E.g.,* '135 patent at claims 1, 55. The specification similarly refers to a "modular device" according to its plain meaning of "physically separate device that can be physically and electrically joined…to enable communication."  '135 patent at 7:42-46 ("The security module 401 and target module 402 are physically separate devices that can be physically and electrically joined (as described further below) to enable communication between the modules 401 and 402.")*; see also* '135 patent at Fig. 4A, 4B; 4:14-18. The file history does not contain any clear and unambiguous statements disclaiming the ordinary meaning of "modular device."  Indeed, even though the examiner requested that the '135 patent be terminally disclaimed to the '802 patent, the examiner noted that there were differences between the claimed devices. Weiss Decl. Ex. 8 at 4 (noting that a modular device could "joint or communic[a]te" and a peripheral device could "connect and communicate"; "it would have been obvious to one of ordinary skill in the art to include the modular device because the modular device was already well known in the art…").  The Court should therefore adopt SPEX's proposed construction.

### V.    CONCLUSION.

The Court should adopt SPEX's proposed constructions because they are consistent with the intrinsic evidence and the controlling case law.

---

[22] This phrase is used in asserted claims 55, 57 and 58 of the '135 patent.

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

RUSS, AUGUST & KABAT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUSS, AUGUST & KABAT

Respectfully submitted,

DATED: July 13, 2017

RUSS, AUGUST & KABAT

_/s/ Andrew D. Weiss_
Andrew D. Weiss

RUSS, AUGUST & KABAT
Marc A. Fenster, SBN 181067
mfenster@raklaw.com
Ben Wang, SBN 228712
bwang@raklaw.com
Andrew D. Weiss, SBN 232974
aweiss@raklaw.com
12424 Wilshire Boulevard
Twelfth Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-6991

**Attorneys for Plaintiff**
**SPEX TECHNOLOGIES, INC.**

26

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 13, 2017.  As such, this document was served on all counsel who have consented to electronic service.

*/s/ Andrew D. Weiss*
Andrew D. Weiss

RUSS, AUGUST & KABAT

27

**PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**