1  CHRISTOPHER D. BRIGHT (SBN 206273)
2  christopher.bright@morganlewis.com
   MORGAN, LEWIS & BOCKIUS LLP
3  600 Anton Boulevard, Ste. 1800
4  Costa Mesa, CA 92626
   Tel: 714.830.0600
5  Fax: 714.830.0700

6
   Attorneys for Defendant
7  APRICORN

8

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11

12  SPEX TECHNOLOGIES, INC.            )  CASE NO.: 2:16-CV-07349 JVS
                                       )  (ARGx)
13          Plaintiff                  )
                                       )
14       v.                            )  Hon. James V. Selna
                                       )
15                                     )  **MEMORANDUM OF POINTS AND**
    APRICORN                           )  **AUTHORITIES IN SUPPORT OF**
16                                     )  **APRICORN'S MOTION FOR**
                                       )  **SUMMARY JUDGMENT OF**
17          Defendant,                 )  **NONINFRINGEMENT**
                                       )
18                                     )
                                       )  Date: November 12, 2019
19                                     )
                                       )  Time: 1:30 p.m.
20                                     )  Location: Courtroom 10C
                                       )
21  _____  )

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

## Contents

I.      INTRODUCTION ............................................................................................. 1

II.     BACKGROUND ............................................................................................... 1

III.    LEGAL STANDARDS ..................................................................................... 2

IV.     ARGUMENT .................................................................................................... 4

    A.   Plaintiff SPEX has failed to prove Apricorn's accused products include the literal or equivalent line that goes from an item 911 ("CONFIG REGISTERS") for "LOCAL DATA" that goes to the "CRYPTO PROCESSOR INTERFACE" in Interface control device 910 (as shown in Fig. 9B) of the '802 patent. ........................... 4

    B.   Plaintiff SPEX has failed to identify literal or equivalent structure for the "PCMCIA" components (items 8, 16 and 18) in Interface control device 910 (as shown in Fig. 9B) in the '802 patent. ................................................................................................ 8

    C.   Plaintiff SPEX Has Failed to Prove a "Defined Interaction" as recited in the claim element "target means for enabling a defined interaction with a host computing device" – Apricorn's Accused Products Or Use Thereof. ................................................. 10

    D.   Plaintiff SPEX has failed to prove that Apricorn's accused products include the literal or equivalent corresponding structure of Interface control device 910 (as shown in Fig. 9B) of the '802 patent that ensures data "must first pass through" the "security means." ................................................................................ 14

    E.   Plaintiff SPEX fails to prove that Apricorn's accused products perform the function that "the communicated data must first pass through" the security means rather than other structures in Apricorn's accused products. ............................................................. 16

    F.   Plaintiff SPEX has failed to prove that Apricorn's accused products respond to an "explicit instruction to operably connect" in claims 1 and 2 of the '802 patent. .................................. 24

1
2

## TABLE OF CONTENTS
### (continued)

**Page**

3
4

G.    Plaintiff SPEX Has Failed to Prove a "Security Means" Separate
      From a "Means for Mediating" in Apricorn's Accused Products. ..... 19

5
6

V.    CONCLUSION ............................................................................................. 26

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017) ............................................................. 25

*Charles E. Hill & Assocs. v. Compuserve Inc.*,
Case No. IP 97-0434-C-M/S 2003 U.S. Dist. LEXIS 18187 (S.D.
Ind. Sep. 26, 2003) ................................................................................. 3

*Chef America, Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004) ............................................................ 18

*Hamilton v. State Farm Fire & Cas. Co.*,
270 F.3d 778 (9th Cir. 2001) ......................................................... 23, 24

*Linear Tech. Corp v. Impala Linear Corp, Case No. No C-98-1727-VRW*,
2001 U.S. Dist. LEXIS 25905 (N.D. Cal. Sep. 21, 2001) ...................... 2

*Microsoft Corp. v. Multi-tech Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004) ............................................................ 25

*NCR Corp. v. Palm, Inc.*,
217 F. Supp. 2d 491 (D. Del. 2002) ....................................................... 2

*New Hampshire v. Maine*,
532 U.S. 742 (2001) .............................................................................. 23

*Sammon v. Nat'l Hand Tool Div.*,
Case No. 99-1459, 2000 U.S. App. LEXIS 16987 (Fed. Cir. 2000) ...................... 2

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001) ............................................................. 2

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ............................................................ 25

**Statutes**

35 U.S.C. § 101 ............................................................................................ 20

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Other Authorities**

4

Fed. R. Civ. P. 56 ..................................................................................................... 1

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **I.      INTRODUCTION**

2          Plaintiff SPEX Technologies, Inc. ("Plaintiff" or "SPEX") has asserted

3   means-plus-function claims 1, 2, 11, and 12 of U.S. Patent No. 6,088,802 (the

4   "'802 patent") (collectively, "the Asserted Claims" of "the Asserted Patent")

5   against Defendant Apricorn ("Defendant" or "Apricorn").  Pursuant to Fed. R. Civ.

6   P. 56, Defendant Apricorn moves for summary judgment of noninfringement of the

7   Asserted Claims of the Asserted Patent, the only remaining patent claims in this

8   case.  Plaintiff SPEX's infringement theories attempt to re-capture subject matter

9   excluded by the Court's construction of the corresponding structure for the asserted

10  means-plus-function claims, excluded during briefing on Defendant Apricorn's

11  motion to dismiss, and excluded during pending *inter partes* review (IPR)

12  proceedings in the U.S. Patent and Trademark Office.  The Court construed the

13  means-plus-function claims to require a particular structure with numerous

14  components, and SPEX fails to prove that Apricorn's accused products include

15  each of those components, literally or equivalently.

16  **II.     BACKGROUND**

17         Defendant Apricorn is a small California technology company that designs

18  and sells the secure storage devices accused of infringement in the present case.

19  Dkt. 1, ¶¶ 23, 35.  Plaintiff SPEX is a non-practicing entity that acquired the

20  Asserted Patent from a company named Spyrus.  Dkt. 1, ¶ 9.  Defendant Apricorn

21  developed the accused products independent of knowledge of the Asserted Patent.

22         After alleging infringement of two patents in this case, followed by IPRs of

23  those patents and an agreement to dismiss one of those patents, SPEX's case is now

24  limited to means-plus-function claims 1, 2, 11, and 12 of the '802 patent.  Claim 1

25  is an independent claim upon which claim 2 depends, and claim 11 is an

26  independent claim upon which claim 12 depends.  Each of the grounds for

27  Apricorn's motion for summary judgment are common to all of the Asserted

28  Claims, except for the argument made in Section V.G. in this memorandum.

## III.   LEGAL STANDARDS

The general legal standards for summary judgment of noninfringement are well-known and therefore will not be repeated here.  Where an accused product lacks corresponding structure for a means-plus-function claim, summary judgment of noninfringement is proper.  *See, e.g., Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1331-1332 (Fed. Cir. 2001) ("Telemac was unable to point to any component of the accused device which corresponds to the claimed 'communication means' … Nothing in the accused device was shown to function in the manner required by the claims or in an equivalent manner …") (affirming summary judgment of noninfringement of means-plus-function claims); *Sammon v. Nat'l Hand Tool Div.*, Case No. 99-1459, 2000 U.S. App. LEXIS 16987, at *10-12 (Fed. Cir. 2000) ("Because claim 1 of the '457 patent requires this function and corresponding structure - both of which are absent in the accused device - the district court correctly granted summary judgment precluding literal infringement … Because one element of claim 1 of the '457 patent is missing from NHT's mechanism and the record clearly shows no equivalent element, NHT's mechanism cannot infringe under the doctrine of equivalents) (same).

In particular, the lack of the corresponding circuit for a means-plus-function claim is grounds for summary judgment of noninfringement.  *See, e.g., NCR Corp. v. Palm, Inc.*, 217 F. Supp. 2d 491, 526-528 (D. Del. 2002) ("In contrast to the Hale patents' use of rows of discrete switches, the touch screen digitizer employed by the accused devices is a single, continuous structure.  Touching the touch screen digitizer of the accused devices with a stylus or finger does not complete or energize an electrical circuit as a 'switch' or array of switches would … There is no structural equivalence between the plurality of discrete switches and the touch screen digitizer of the accused devices …"); *Linear Tech. Corp v. Impala Linear Corp, Case No. No C-98-1727-VRW*, 2001 U.S. Dist. LEXIS 25905, at *37-38 (N.D. Cal. Sep. 21, 2001) ("Under the construction of claim 44 adopted by the

court in this order, it is clear that the structure used in the Unitrode parts is not the same as the claimed structure, a variable frequency, fixed off-time, one-shot circuit … Given the undisputed benefits gained by the fixed frequency approach of the PWM circuit and the completely different way in which these different types of circuits vary the duty cycle (one by fixing the frequency and the other by varying it), the court concludes that no reasonable jury could find them to be equivalent.") (same); *Charles E. Hill & Assocs. v. Compuserve Inc.*, Case No. IP 97-0434-C-M/S 2003 U.S. Dist. LEXIS 18187, at * (S.D. Ind. Sep. 26, 2003) ("Much of Hill's argument is premised on the assumption that if the accused CompuServe system was fed constant and variable data, it has the means capable of manipulating that data. In other words, because the accused CompuServe system is capable of manipulating data, it must infringe. But, … Hill's argument 'would entirely vitiate the limitations of' the disputed means-plus-function claim elements that contain the constant and variable data limitations.") (same).

## IV.   STATEMENT OF FACTS

Apricorn has submitted a Statement of Uncontroverted Facts and Conclusions of Law which recites the evidence cited in this memorandum that demonstrates that there is no genuine issue of material fact for Apricorn's motion for summary judgment of noninfringement.  As further explained in this memorandum, SPEX has offered expert opinions that admit to the absence of claim elements in Apricorn's accused products, fail to address claim elements for Apricorn's accused products, and attempt to recapture claim scope rejected by the Court's claim constructions and excluded by SPEX's arguments during IPR.  The '802 patent and relevant excerpts of SPEX's expert opinions have been submitted with this motion.  Bright Decl. Ex. 1 ('802 patent); Bright Decl. Ex. 2 (Gomez expert report); Bright Decl. Ex. 3 (Gomez deposition testimony).

1  **V.    ARGUMENT**

2      **A.    Plaintiff SPEX has failed to prove Apricorn's accused products**

3          **include the literal or equivalent line that goes from an item 911**

4          **("CONFIG REGISTERS") for "LOCAL DATA" that goes to the**

5          **"CRYPTO PROCESSOR INTERFACE" in Interface control**

6          **device 910 (as shown in Fig. 9B) of the '802 patent.**

7          Claims 1, 2, 11 and 12 of the '802 patent recite a "means for mediating

8  communication of data between the host computing device and the target means so

9  that the communicated data must first pass through the security means."  The Court

10  construed this term as means-plus-function and the corresponding structure as

11  "Interface control device 910 (as shown in Fig. 9B)."  Dkt. 62 at 31-32.  As

12  observed by the Court, "Figure 9B provides particularized disclosure of component

13  parts, i.e. structure, for interface control device 901 … a person of skill in the art

14  has significant additional details about the interactions between the component

15  parts of the interface control device 910 with corresponding structure as a result of

16  Figure 9B itself."  *Id.* at 37.  Yet Plaintiff SPEX's expert ***volunteered*** and admitted

17  at his deposition that a component of Interface control device 910 (as shown in Fig.

18  9B) is ***missing*** from Apricorn's accused products, and he offers no equivalent

19  structure theory.

20          Among other things, Interface control device 910 (as shown in Fig. 9B) in

21  the '802 patent includes a line that goes from an item 911 ("CONFIG

22  REGISTERS") for "LOCAL DATA" that goes to the "CRYPTO PROCESSOR

23  INTERFACE", depicted below.  As one can see, as highlighted below, the Interface

24  control device 910 (as shown in Fig. 9B) in the '802 patent includes everything

25  inside the dotted line, including the line that goes from an item 911 ("CONFIG

26  REGISTERS") for "LOCAL DATA" that goes to the "CRYPTO PROCESSOR

27  INTERFACE".  **The Court's claim construction thus requires the line that goes**

28  **from an item 911 ("CONFIG REGISTERS") for "LOCAL DATA" that goes**

1  **to the "CRYPTO PROCESSOR INTERFACE"** in Interface control device 910

2  (as shown in Fig. 9B) of the '802 patent (shown in orange below).



16  Plaintiff SPEX's expert volunteered and admitted at his deposition that

17  Apricorn's accused products do not have that structure:

18  Q And I'm just saying there is no other possible path for the data to

19  get to the CompactFlash interface in Figure 9B other than through the

20  crypto processor, right?

21  A From all the evidence I've seen and all the different documentation,

22  the Apricorn devices -- including the deposition transcripts -- have all

23  of the data encrypted.  Now, there is ***one line on Figure 9B that goes***

24  ***from the configuration registers through the local data up to the***

25  ***crypto processor interface***. *I don't believe the Apricorn products*

26  *perform that function or use that in that way*.

27  Bright Decl. Ex. 3, pp. 225-226 (emphasis added).  Nor does Plaintiff SPEX's

28  expert offer an opinion of equivalents for that very structure.  Bright Decl. Ex. 2,

pp. 69-72, ¶¶ 176-180; p. 76, ¶ 198.  Indeed, Plaintiff SPEX's expert report never mentions the line from the configuration registers for "LOCAL DATA" to the crypto processor interface in Interface control device 910 (as shown in Fig. 9B) of the '802 patent.  *Id.*, p. 63, ¶ 156 (referring to "configuration registers" but making no mention of any line from the registers for "LOCAL DATA"); p. 56, ¶ 141 (same); p. 57, ¶ 144 (same); p. 67, ¶ 171 (same); p. 68, ¶ 173 (same); pp. 68-69, ¶ 174 (same).

Plaintiff SPEX's failure to show that Apricorn's accused products include the line from the configuration registers for "LOCAL DATA" to the crypto processor interface in Interface control device 910 (as shown in Fig. 9B) is further understood in the following context.  Plaintiff SPEX's expert report identified alleged configuration registers in the Apricorn accused products as corresponding to element 911 ("CONFIG REGISTERS").  Bright Decl. Ex. 2, p. 56, ¶ 141; p. 57, ¶ 144; p. 63, ¶ 156; p. 67, ¶ 171; pp. 68-69, ¶¶ 173-174.  But SPEX's expert did not attempt to show that Apricorn's accused products have the structure of 910 in Figure 9B that includes the "one line on Figure 9B that goes from the configuration registers through the local data up to the crypto processor interface."  *Compare id. with* Bright Decl. Ex. 3, pp. 225-226.  Nowhere does SPEX's expert report even mention the "LOCAL DATA" line in Interface control device 910 (as shown in Fig. 9B) of the '802 patent let alone attempt to identify any alleged equivalent structure in the Apricorn accused products.  *Id.*

Plaintiff SPEX has erroneously treated element 911 as if it were generic configuration registers in isolation rather than the specific configuration registers arranged as required in Figure 9B, including the operation of 911 for the "LOCAL DATA" line in Interface control device 910 (as shown in Fig. 9B).  That is an error that is fatal to SPEX's case.  The '802 patent is clear that the structure and function of the configuration registers cannot be understood from Figure 9B's depiction of configuration registers 911 alone.  '802 patent, col. 17:24-33 ("The interface

6

control device 910 includes sets of configuration registers 911. The data stored in the configuration registers 911 establish operating characteristics of the interface control device: in particular, the content of the configuration registers enables the interface control device to present to the host computing device a desired identification of the peripheral device, and determines whether data passing through the peripheral device must be subjected to security operations.")  It was that very description in the '802 patent that led to the Court's observation that "a person of skill in the art has significant additional details about the interactions between the component parts of the interface control device 910 with corresponding structure as a result of Figure 9B itself."  Dkt. 62 at 37 (previously citing '802 patent, col. 17:25-36).  Plaintiff SPEX's expert report does not address the full set of requirements for the configuration registers of interface control device 910 described in the '802 patent, including the operation of 911 for the "LOCAL DATA" line in Interface control device 910 (as shown in Fig. 9B).  '802 patent, col. 17:25-33.

The only equivalents argument put forward for Interface control device 910 (as shown in Fig. 9B) by Plaintiff SPEX's expert regards four blocks of Figure 9B that are related to Compact Flash (shown in green below); which does not address the line from the configuration registers 911 for "LOCAL DATA" to the crypto processor interface in Interface control device 910 (as shown in Fig. 9B) of the '802 patent (shown in orange below).  Bright Decl. Ex. 2, pp. 69-72, ¶¶ 176-180.

1
2
3
4
5
6
7
8
9
10
11
12



13

Having failed to prove that the structure of the "LOCAL DATA" line (shown in orange above) in Interface control device 910 (as shown in Fig. 9B) in the '802 patent is in Apricorn's accused products, literally or equivalently, Plaintiff SPEX has failed to prove the "means for mediating" in Apricorn's accused products. Thus, Plaintiff SPEX has failed to prove infringement by Apricorn's accused products of claims 1, 2, 11 and 12 of the '802.

**B.  Plaintiff SPEX has failed to identify literal or equivalent structure for the "PCMCIA" components (items 8, 16 and 18) in Interface control device 910 (as shown in Fig. 9B) in the '802 patent.**

The corresponding structure for the "means for mediating …" in Interface control device 910 (as shown in Fig. 9B) in the '802 patent depicts "PCMCIA" components (items 8, 16 and 18) (shown in blue below).

1
2
3
4
5
6
7
8
9
10
11
12



13    Plaintiff SPEX's expert report mistakenly opines that Apricorn's accused

14  products literally include these "PCMCIA" components (items 8, 16 and 18). *See,*

15  *e.g.*, Bright Decl. Ex. 2, pp. 63-64, ¶¶ 156, 158.  Yet it is indisputable that

16  Apricorn's accused products do not include PCMCIA structures but rather include

17  USB structures, as acknowledged by SPEX's expert report.  *Id.*, p. 31, ¶ 68; *Id.*, p.

18  32, ¶ 71.  Moreover, SPEX's expert report does not offer an opinion of structural

19  equivalents for these components.  *Id.*, pp. 63-72, ¶¶ 156-180.  As was mentioned

20  above, the only equivalents argument put forward for Interface control device 910

21  (as shown in Fig. 9B) by Plaintiff SPEX's expert regards four blocks of Figure 9B

22  that are related to Compact Flash (shown in green above); which does not address

23  the "PCMCIA" components (items 8, 16 and 18) in Interface control device 910 (as

24  shown in Fig. 9B) of the '802 patent (shown in blue above).  *Id.*, pp. 69-72, ¶¶ 176-

25  180.

26    Having failed to prove that the structure of the "PCMCIA" components

27  (items 8, 16 and 18) (shown in blue above) in Interface control device 910 (as

28

shown in Fig. 9B) in the '802 patent is in Apricorn's accused products, literally or equivalently, Plaintiff SPEX has failed to prove the "means for mediating" in Apricorn's accused products.  Thus, Plaintiff SPEX has failed to prove infringement by Apricorn's accused products of claims 1, 2, 11 and 12 of the '802.

**C.    Plaintiff SPEX Has Failed to Prove a "Defined Interaction" – as recited in the claim element "target means for enabling a defined interaction with a host computing device" – in Apricorn's Accused Products Or Use Thereof.**

Claims 1, 2, 11, and 12 of the '802 patent recite the term "defined interaction" in the claim element "target means for enabling a defined interaction with a host computing device."  There are at least three requirements of the claim language and Plaintiff SPEX's case is missing at least two of them.  Stating two of those three requirements, the Court construed a "defined interaction" as "[1] an interaction [with a host computing device] that [2] can provide one or more of a variety of functionalities."  *Id.* at 6.  The Court's claim construction for "defined interaction" thus requires both an "interaction with a host computing device" and that the interaction "can provide one or more of a variety of functionalities." Further, as for requirement [3], the surrounding claim language (specifically, "target means for enabling a defined interaction with a host computing device") requires that the defined interaction is enabled by the target means.  Plaintiff SPEX's expert identified an alleged functionality in Apricorn's accused products ("storage of encrypted data") for requirement [2].  But he failed to prove requirements [1] and [3]:  [1] to identify that any interaction that provides that functionality is an interaction "with a host computing device" and [3] that the interaction is enabled by the target means.  Bright Decl. Ex. 2, pp. 40-42, ¶¶ 97-102.

Regarding requirement [1] of the Court's claim construction for the "defined interaction" term (*i.e.*, "an interaction [with a host computing device]"), it is

1   important to note that the Court rejected SPEX's proposed claim construction of

2   "defined interaction" as "a specific, predefined functionality of the device, such as

3   data storage, data communication, data input and output or user identification."

4   Dkt. 62 at at 6-7.  In so doing, the Court rejected Plaintiff SPEX's attempt to equate

5   "defined interaction" with a functionality.  *Id.* at 9 ("The Court similarly agrees that

6   ***swapping the term 'interaction' for the term 'functionality' would be in error*** …

7   It would be nonsensical to construe an 'interaction' as a 'functionality' because it

8   would lead portions of the specification to effectively state that a 'functionality

9   provides a functionality.'") (emphasis added).[1]

10       Plaintiff SPEX's infringement theory attempts to re-capture a "defined

11   interaction" as merely a functionality, contrary to the Court's claim construction.

12   Plaintiff SPEX's expert report states:  "They [memory modules in Apricorn's

13   accused products] all also enable a ***defined interaction*** with a host computing

14   device ***in that they enable the storage of encrypted data***."  Bright Decl. Ex. 2, p.

15   40, ¶ 98 (emphasis added); *id.*, p. 75, ¶ 195.  Plaintiff SPEX's expert thus

16   erroneously equates "defined interaction" with the functionality of encrypted data

17   storage.  *Id.*  This confirmed yet again by Plaintiff SPEX's expert when he

18   identifies the "type of defined interaction" as a USB class code which identifies the

19   functionality such as data storage.  *Id.*, pp. 80-81, ¶ 214 ("use of the Apricorn

20   products will result in the devices providing to the host information regarding the

21   type of defined interaction in response to the request from the host computing

22   device"), ¶ 215 ("The USB specifications require a device to provide its class code.

23   This code identifies a device's functionality to the host, including functionality such

24   _____

25   [1] Defendant Apricorn argued during claim construction that the "defined
    interaction" term renders the Asserted Claims invalid as indefinite, while Plaintiff
26   SPEX argued that the term meant "a specific, predefined functionality of the
    device, such as data storage, data communication, data input and output or user
27   identification."  Dkt. 62 at 6-7.  The Court rejected both parties' proposals.  *Id.* at
28   9.

as mass storage and content security classes."); *accord id.*, p. 85, ¶ 224 ("Class codes supported by the USB interface identify the defined interactions.").  This is further confirmed by the deposition testimony of Plaintiff SPEX's expert.  Bright Decl. Ex. 3, pp. 215:20-217:22.

Failing to prove requirement [1], nowhere did SPEX's expert identify an "interaction" in Apricorn's accused products as required by the Court's claim construction, rather than the functionality of "the storage of encrypted data."  Bright Decl. Ex. 2, pp. 40-42, ¶¶ 97-102.  Nowhere did SPEX's expert identify an interaction "with a host computing device" in Apricorn's accused products that provides the alleged encrypted data storage functionality.  *Id.*  At most, SPEX's expert opined that Apricorn's "accused products" can interact with a host computing device (*id.*, pp. 40-41, ¶ 99); but he did not opine that the interaction between the Initio chips in Apricorn's accused products and the memory in Apricorn's accused products (which allegedly provides encrypted data storage) is an interaction with a host computing device (*id.*, pp. 41-42, ¶¶ 100-102).

Failing to prove requirement [3], nowhere did SPEX's expert opine that the memory (the alleged "target means") in Apricorn's accused products enable such an interaction as required by the Court's claim construction (which allegedly provides encrypted data storage) with a host computing device.  *Id.*, pp. 40-42, ¶¶ 97-102.  Nor could he because, as admitted by SPEX's expert, Apricorn's accused products use a different protocol to communicate with a host computing device (USB) than the protocol they use to provide for data storage (NAND flash drive interface or SATA interface).  *Id.*, pp. 41-42, ¶¶ 100-102.  As acknowledged by SPEX's expert, any interaction with the host computer is via USB.  *Id.*, pp. 41-42, 49-50, ¶ 100 ("data from the host computer will travel onto the [1861 chip] through the USB interface"), ¶ 102 ("[3607 chip] includes a USB interface"), ¶ 123 ("the accused products use the USB interface to communicate with a host computing device").  But, in contrast, the memory in Apricorn's accused products (the alleged "target

means") does not support USB or communicate via USB, *i.e.*, the memory enables a functionality of data storage but the memory cannot enable USB interaction. *Id.*, pp. 41-42, 45-46, ¶ 100 ("the encrypted data will travel across the NAND flash drive interface to the flash memory module"), ¶ 102 (3607 chip includes a Serial ATA (SATA) interface), ¶ 113 ("data from the encryption engine will go through a SATA interface in order to get to the storage medium") (internal quotations and citations omitted); Bright Decl. Ex. 3, pp. 134-135 ("Q. Okay. And one of the active translations is from USB to SATA? A. It shows here on the 3607 for the data to communicate from the host to a target, it must go through the USB and then get translated to a SATA protocol, yes.").  All of this can be seen depicted in the block diagrams offered by SPEX's expert report for Apricorn's accused products, which depict USB for communications with the host computer, but in contrast, depict NAND flash or SATA for communications with the memory.  *Id.*, pp. 30-32, ¶¶ 67, 71.  The memory (the alleged "target means") in Apricorn's accused products (which do not communicate via USB) therefore cannot possibly enable an interaction with a host computing device via USB.[2]

Having applied the "defined interaction" term only to the data storage functionality in Apricorn's accused products – subject matter rejected by the Court's claim construction – Plaintiff SPEX has failed to prove a "defined interaction" in Apricorn's accused products or use thereof.  Thus, Plaintiff SPEX has failed to prove infringement by Apricorn's accused products of claims 1, 2, 11, and 12 of the '802.

---

[2] Nor could the memory in Apricorn's accused products (the alleged "target means") enable such an interaction because they are passive components, of which the Court can take judicial notice.

**D.**   **Plaintiff SPEX has failed to prove that Apricorn's accused products include the literal or equivalent corresponding structure of Interface control device 910 (as shown in Fig. 9B) of the '802 patent that ensures data "must first pass through" the "security means."**

Claims 1, 2, 11 and 12 of the '802 patent recite a "means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means." The Court construed this term as means-plus-function and the recited function as "mediating communication of data between the host computing device and the target means so that the communicated data *must first pass through* the security means." Dkt. 62 at 31-32 (emphasis added). As was mentioned above, the Court construed the corresponding structure as "Interface control device 910 (as shown in Fig. 9B)." *Id.* Interface control device 910 (as shown in Fig. 9B) depicts a connection (shown in red below) that ensures data "must first pass through" the "security means" by way

1   of a crypto processor interface (shown in purple below):



14          Plaintiff SPEX's expert identifies what he refers to as "AES cryptographic

15   controller" or "AES block" as the alleged "security means."  Bright Decl. Ex. 2, p.

16   36, ¶¶ 86-87; pp. 61-64, ¶¶ 152-159; p. 76, ¶ 198.  Plaintiff SPEX's expert

17   identifies a laundry list of structures in Apricorn's accused products, but nowhere

18   does he identify in Apricorn's accused products the corresponding structure of

19   Interface control device 910 (as shown in Fig. 9B) of the '802 patent that ensures

20   data "must first pass through" the AES block.  *Id*.  Instead of mapping Interface

21   control device 910 (as shown in Fig. 9B) of the '802 patent to the structures of

22   Apricorn's accused products for this function of ensuring data "must first pass

23   through" through the security means (what SPEX's expert alleges is the AES

24   block), SPEX's expert merely opines that all data written to the storage medium in

25   the Apricorn accused products is encrypted.  *Id.*, pp. 61-63, ¶¶ 153-155.

26          A cursory glance of the structures of the Apricorn accused products shows

27   that there is no path that requires that the data "must first pass through" through the

28   security means (what SPEX's expert alleges is the AES block/engine/module) in

Apricorn's accused products.  *Id.*, pp. 30-33, ¶¶ 66-73.  As depicted by the highlighting of the diagrams put forward by SPEX's expert as evidence of Apricorn's accused products, the products are not structured such that data must pass through the AES block.  *Id.*, pp. 30-32, ¶¶ 67, 71; Bright Decl. Ex. 4 (diagram excerpts) (highlighting added).  Nor is there a data path in Apricorn's accused products like the data path (shown in red above) that ensures data "must first pass through" the "security means" by way of a crypto processor interface (shown in purple above).  *Id.*  That is why SPEX's expert does not map Interface control device 910 (as shown in Fig. 9B) of the '802 patent to the structures of Apricorn's accused products for this function of ensuring data "must first pass through" through the security means (what SPEX's expert alleges is the AES block).  *Id.*, pp. 61-63, ¶¶ 153-155.

Having failed to prove the structure in Interface control device 910 (as shown in Fig. 9B) in the '802 patent for ensuring that data "must first pass through" the security means is in Apricorn's accused products, literally or equivalently, Plaintiff SPEX has failed to prove the "means for mediating" in Apricorn's accused products.  Thus, Plaintiff SPEX has failed to prove infringement by Apricorn's accused products of claims 1, 2, 11 and 12 of the '802.

    **E.**    **Plaintiff SPEX fails to prove that Apricorn's accused products perform the function that "the communicated data must first pass through" the security means rather than other structures in Apricorn's accused products.**

As was mentioned in the previous section, claims 1, 2, 11, and 12 of the '802 patent recite means for "mediating communication of data between the host computing device and the target means so that *the communicated data must first pass through the security means*."  The argument in this section focuses on this

quoted functional claim language,[3] whereas the argument in the previous section focused on the lack of corresponding structure in Apricorn's accused products.

The infringement theory put forward by Plaintiff SPEX's expert is as follows: "The Apricorn configuration scheme ensures that all data must first pass through the security means <u>before it is stored on the storage media</u>. The Apricorn configuration scheme does not provide for any alternative means for data to be stored on the storage media without first passing through the security means." Bright Decl. Ex. 2, p. 61, ¶ 152 (emphasis added); *id.*, p. 76, ¶ 198.

The first problem with Plaintiff SPEX's infringement theory is that it is a blatant attempt to re-write the claim language. The claims do not recite "the communicated data must first pass through" security "before it is stored on the storage media," or anything like it. The claims starkly say that the data "the communicated data must first pass through" a security means. SPEX's attempted re-write of the claim language also reads out the word "first." Without the word "first," the claim language becomes means for "mediating communication of data between the host computing device and the target means so that the communicated data must ~~first~~ pass through the security means." Leaving out the word "first" still results in claim language that requires that data must pass through the security means for data communicated between the host computing device and the target means. So the word "first" must mean something more in the claim language.

SPEX's attempt to re-write the claim language does not even make sense in the context of the corresponding structure in Figure 9B of the '802 patent. Figure

---

[3] The PTAB found that "mediating communication of the exchanged data between the host computing device and the peripheral device so that the exchanged data must first sass [pass] through means for performing the one or more security operations" to be present in the prior art during IPR proceedings. Bright Decl. Ex. 5 at 42 ("Petitioner has sufficiently shown that Dumas, in the proposed combinations, teaches or suggests a step that mediates communications between a host and a target means (a peripheral device) 'so that the exchanged data must first [pass] through means for performing the one or more security operations.'").

9B above shows that data is buffered in memory (item 16) before the data proceeds to a crypto processor interface.  So SPEX's attempt to re-write the claim language such that the communicated data must first pass through the security means "before it is stored on the storage media" contradicts Figure 9B's disclosure of data being buffered in memory before being communicated to a security means.  Although SPEX may not like it and would like to re-write it, the claim language plainly requires that data "the communicated data must first pass through" the security means and SPEX cannot re-write them now.  *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("we construe the claim as written, not as the patentees wish they had written it").

The structure in Figure 9B ensures that communicated data only passes through the means for mediating (910) before going to the security means through the crypto processor interface.



As was mentioned above, interface control device 910 (as shown in Fig. 9B) depicts a connection (shown in red above) that ensures that "the communicated data

1    must first pass through" the "security means" by way of a crypto processor

2    interface (shown in purple above).  The data is data that has been communicated

3    through the PCMCIA interface (means for enabling communication with the host

4    computing device).  Dkt. 62 at 43-44.  The structure in Figure 9B thus ensures that

5    the data (communicated through the PCMCIA interface) does not pass through

6    other elements outside of the means for mediating (910) before going to the security

7    means through the crypto processor interface.

8         In contrast, Plaintiff SPEX's expert does not offer evidence that "the

9    communicated data must first pass through" a security means in Apricorn's accused

10   products.  Plaintiff SPEX's expert identities the "AES cryptographic controller" as

11   the alleged security means in Apricorn's accused products.  Bright Decl. Ex. 2, p.

12   36, ¶¶ 86-87; p. 64, ¶ 159; p. 76, ¶ 198.  But he does not opine that the

13   communicated data must "first" pass through the AES block, *e.g.*, that the

14   communicated data does not first pass through other elements in Apricorn's

15   accused products that are not part of the allegedly infringing elements in those

16   products.  *Id.*, pp. 61-63, ¶¶ 151-155.  All of the evidence cited by SPEX's expert

17   merely recounts that data goes through the AES block for encryption before being

18   stored in Apricorn's accused products.  *Id.*, pp. 61-63, ¶¶ 153-155.  But none of that

19   includes evidence that the communicated data "first" goes to the AES block, *e.g.*,

20   without going through other elements as mentioned above.  *Id.*

21        Plaintiff SPEX has failed to prove that data "the communicated data must

22   first pass through" security in Apricorn's accused products.  Thus, Plaintiff SPEX

23   has failed to prove infringement by Apricorn's accused products of claims 1, 2, 11,

24   and 12 of the '802 patent.

25        **F.    Plaintiff SPEX Has Failed to Prove a "Security Means" Separate**

26              **From a "Means for Mediating" in Apricorn's Accused Products.**

27        Claims 1, 2, 11 and 12 of the '802 patent recite a "security means" and a

28   "means for mediating communication of data between the host computing device

and the target means so that the communicated data must first pass through the security means." This claim language clearly recites a "means for mediating" separate from a "security means." Confirming this separation, in opposing Apricorn's motion to dismiss due to patent ineligible subject matter under 35 U.S.C. § 101, Plaintiff SPEX repeatedly argued that the "security means" and "means for mediating" must be discrete hardware components as follows:

> The claims are directed to specific, concrete devices, not an abstract idea. For example, the peripheral device claimed by ***claim 11 of the '802 patent has five specific hardware components***: (1) a ***security means*** (e.g., a ***hardware encryption chip***); (2) a target means (e.g., a hard drive or flash drive); (3) an internal communication means (e.g., a computer bus); (4) an external communication means (e.g., a USB or SATA connection); and (5) a ***mediating means*** (e.g., ***hardware the ensures that data passes through the security means***) … The hardware limitations of the claims, such as the mediating means, security mean and target means, are a substantial inventive concept well beyond the alleged abstract idea. This is particularly true when the combination of elements in the claims is considered as whole.

Dkt. 27 at 1-2 (emphasis added); *also see id.* at 8-9 ("The claimed peripheral device [claim 11 of the '802 patent] has five specified hardware components: (1) a security means (e.g., a hardware cryptography chip) … (5) a mediating means (e.g., hardware the ensures that data passes through the security means) … Claim[] 1 … of the '802 patent … claim[s] further variations of the novel hardware …"); *id.* at 11 ("Defendant here similarly argues that the patents-in-suit claim nothing more than, effectively, protecting sensitive information. The patents-in-suit, however, claim more than that. For example, claim 11 of the '802 patent claims a specifically-configured peripheral device that includes a number of hardware limitations, including a security means, target means and mediating means that controls the

1  flow of data between the host computer, security means and target means."); *id.* at

2  18 ("[T]he inventive concept in claim 11 of the '802 patent includes a novel

3  combination of security means, target means, two types of communications means

4  and a mediating means.").  Plaintiff SPEX thus argued to the Court that the "means

5  for mediating" would be separate from that "security means" because the mediating

6  means "ensures that data passes through the security means."  *Id.*  The Court ruled

7  in SPEX's favor and denied Apricorn's motion to dismiss reasoning that the claim

8  "describes a ***physical structure that contains a combination of components***, not a

9  method or system that uses a general computer to secure access to secret

10  information."  Dkt. 29-1 at 7-8 (emphasis added).

11  　　Consistent with the Court's ruling on Apricorn's motion to dismiss, the Court

12  construed the "means for mediating …" in the Asserted Claims to have the

13  corresponding structure of Interface control device 910 (as shown in Fig. 9B).  Dkt.

14  62 at 31-32.  As observed by the Court, "Figure 9B is dedicated to setting out

15  components of an exemplary interface control device 910 and that device's

16  relationship to surrounding interfaces."  *Id.* at 36.  Of course, Figure 9B in the '802

17  patent depicts that the Interface control device 910 (the "means for mediating …")

18  (shown in yellow below) is separate from the crypto processor (the "security

19  means" being on the other side of the crypto processor interface (shown in purple

20  below)):[4]

21

22

23

24

25

26  _____

27  [4] The Court construed the "security means …" as a "specific hardware component
programmed or configured to perform a security operation disclosed in '802 Patent

28  at 18:1-47…"  Dkt. 62 at 17.

1
2
3
4
5
6
7
8
9
10
11
12



13 The Court's claim construction thus – consistent with the Court's denial of
14 Apricorn's motion to dismiss – reflects separate hardware components for the
15 "means for mediating" (Interface control device 910) and the "security means" (on
16 the other side of the crypto processor interface).  That separation makes sense so
17 that the "means for mediating" can perform its recited function of "mediating
18 communication of data between the host computing device and the target means so
19 that the communicated data must first pass through the security means."
20      Notwithstanding the arguments by Plaintiff SPEX to defeat Apricorn's
21 motion to dismiss, Plaintiff SPEX's expert confirmed at his deposition that he did
22 not apply the Court's claim constructions to require separate hardware components
23 for the "security means" and the "means for mediating":
24      Q Okay. ***So you didn't apply any requirement that there be a***
25      ***physical separation between the security means and the means for***
26      ***mediating***?
27      MR. WANG: Objection. Mischaracterizes the record and prior

28

1   testimony.

2       THE WITNESS: ***I don't think there is a requirement in that claim***.

3   We can go to the construction if there is additional information in

4   there about physical requirements. I don't believe there is, though.

5   Bright Decl. Ex. 3, p. 70 (emphasis added).  Disregarding the Court's claim

6   construction and the Court's ruling on Apricorn's motion to dismiss (based on

7   SPEX's arguments), Plaintiff SPEX's expert applied both the "security means" and

8   "means for mediating" to the same Initio chip in each of Apricorn's accused

9   products.[5]  Bright Decl. Ex. 2, p. 36, ¶ 87; *id.*, p. 61, ¶ 152; *id.*, p. 75, ¶ 194; *id.*, p.

10   76, ¶ 198.

11       Judicial estoppel precludes SPEX from identifying the same hardware

12   component for both the "security means" and the "means for mediating."  *See New*

13   *Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain

14   position in a legal proceeding, and succeeds in maintaining that position, he may

15   not thereafter, simply because his interests have changed, assume a contrary

16   position, especially if it be to the prejudice of the party who has acquiesced in the

17   position formerly taken by him."); *see also Hamilton v. State Farm Fire & Cas.*

18   *Co.*, 270 F.3d 778, 782 (9th Cir. 2001) ("Judicial estoppel is an equitable doctrine

19   that precludes a party from gaining an advantage by asserting one position, and then

20   later seeking an advantage by taking a clearly inconsistent position.").  At the

21   beginning of this case, SPEX successfully opposed Apricorn's motion to dismiss by

22   arguing that the "security means" and the "means for mediating" are separate

23

---

24   [5] SPEX's expert continues to apply the claims inconsistently, in an attempt to avoid

25   the invalidity of the Asserted Claims:  "In the MYK-82, Villasenor opines that the

26   same structure, the MYK-82 chip, corresponds to both the security means and the

means for mediating.  In light of this claim element, Villasenor's opinion makes

27   little sense because the means for mediating would not need to perform its recited

function of mediating ***so that data passes through itself***."  Bright Decl. Ex. 6

28   (Rebuttal Expert Report of Miguel Gomez), at p. 59 n.20 (emphasis added).

hardware components.  SPEX cannot now take the inconsistent position that the same hardware component (the same Initio chip) satisfies both the alleged "security means" and the "means for mediating" in Apricorn's accused products.  *See id.*

Having applied both the "security means" and "means for mediating" terms to the Initio chip in each of Apricorn's accused products – subject matter Plaintiff SPEX distinguished in opposing Defendant Apricorn's motion to dismiss – Plaintiff SPEX has failed to prove both a "security means" and "means for mediating" in Apricorn's accused products or use thereof.  Thus, Plaintiff SPEX has failed to prove infringement by Apricorn's accused products of claims 1, 2, 11 and 12 of the '802.

### G.   Plaintiff SPEX has failed to prove that Apricorn's accused products respond to an "explicit instruction to operably connect" in claims 1 and 2 of the '802 patent.

Claims 1 and 2 of the '802 patent recite means for "operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device."  This claim language is virtually identical to the language in claims challenged in an IPR petition (on the related '135 patent), as can be seen below:

| Claims 1 and 2 of the '802 patent | Claims 58 and 58 of the '135 patent |
| --- | --- |
| operably connecting the security *means* and/or the target *means* to the host computing device in response to an instruction from the host computing device | operably connecting the security *module* and/or the target *module* to the host computing device in response to an instruction from the host computing device |

In its preliminary response to an IPR petition (on the related '135 patent), Plaintiff SPEX argued with regard to the "operably connecting …" claim language above that an "explicit instruction to operably connect" is required, consistent with

the plain meaning of the term:

> Next, after the target module has been identified, all of the claims require a separate instruction, and response, i.e., an instruction to operably connect the target module. Petitioner provides no explanation as to how the same "identifying data" could satisfy both types of requests, including the ***explicit instruction to operably connect***.

Bright Decl. Ex. 7, p. 21 (emphasis added).  Plaintiff SPEX repeated this argument in its response to the petition.  Bright Decl. Ex. 8, p. 33 (emphasis added) ("… Petitioner provides no explanation as to how the same 'identifying data' could satisfy both types of requests, including the ***explicit instruction to operably connect***.").  Plaintiff SPEX made this argument for claim language in the '135 patent, which recited "operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device."  Bright Decl. Ex. 7, p. 21; Bright Decl. Ex. 8, p. 33.  The only difference in this claim language from claims 1 and 2 of the '802 patent is that claims 1 and 2 of the '802 patent use the word "means" instead of "module," as can be seen above.

This IPR history of claim language in the related '135 patent can thus be used to understand the similar claim language in claims 1 and 2 of the '802 patent.  *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306-1307 (Fed. Cir. 2007) (disclaimers of claim scope in one patent apply to related patents); *Microsoft Corp. v. Multi-tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) ("[a]ny statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction"); *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1364 (Fed. Cir. 2017) ("[W]e hold that Aylus's statements in the IPR proceeding are a clear and unmistakable surrender of methods invoking the CP logic in claims 2 and 21, and based on these disclaiming

1   statements, we see no error in the district court's claim construction or its grant of

2   summary judgment of noninfringement.").  The parties did not offer different

3   meanings for this claim language.  Dkt. at 62 at 26-31.

4        Yet Plaintiff SPEX's expert does not acknowledge this argument by Plaintiff

5   SPEX that there must be an "explicit instruction to operably connect" and apply it.

6   Bright Decl. Ex. 2, pp. 50-61, ¶¶ 126-150.  Plaintiff SPEX has failed to prove that

7   Apricorn's accused products become operably connected to the host computer in

8   response to an explicit instruction from a host computer.  Thus, Plaintiff SPEX has

9   failed to prove infringement by Apricorn's accused products of claims 1 and 2 of

10   the '802 patent.

11   **VI.   CONCLUSION**

12        For the reasons described herein, Defendant Apricorn respectfully requests

13   that the Court grant this motion for summary judgment of noninfringement of the

14   Asserted Claims of the Asserted Patent.

15

16   Dated:  August 8, 2019

Respectfully submitted,

17       *Christopher D. Bright*       

18   Christopher D. Bright

19   christopher.bright@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP

20   600 Anton Boulevard, Ste. 1800

Costa Mesa, CA 92626

21   Tel: 714.830.0600

22   Fax: 714.830.0700

23   Attorneys for Defendant

24   APRICORN

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

3          I hereby certify that on August 8, 2019, I electronically filed the foregoing
document with the Clerk of the Court for the United States District Court for the
4   Central District of California by using the CM/ECF system, which constitutes
service on all counsel of record to this action.

5

6          Executed on August 8, 2019, at Costa Mesa, California.

7

8                               __/s/ Christopher D. Bright_____
                                CHRISTOPHER D. BRIGHT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28