*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

RUSS, AUGUST & KABAT
Marc A. Fenster, SBN 181067
mfenster@raklaw.com
Ben Wang, SBN 228712
bwang@raklaw.com
Andrew D. Weiss, SBN 232974
aweiss@raklaw.com
12424 Wilshire Boulevard
Twelfth Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-6991

Attorneys for Plaintiff
SPEX TECHNOLOGIES, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| SPEX TECHNOLOGIES, INC., | Case No. 2:16-CV-07349-JVS (ARGx) |
| Plaintiff | **PLAINTIFF SPEX TECHNOLOGIES, INC.'S OPPOSITION TO APRICORN'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT** |
| v. | |
| APRICORN, | |
| Defendant. | |
| | **Hearing:** |
| | Date:    November 12, 2019 |
| | Time:    1:30 p.m. |
| | Place:   Courtroom 10C |
| | Judge:  Hon. James V. Selna |

RUSS, AUGUST & KABAT

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................1

II. LEGAL STANDARD ...........................................................................2

III. ARGUMENT .......................................................................................2

A. To The Extent Necessary, SPEX Has Produced Evidence That The Accused Apricorn Products Include A Connection Between The Configuration Registers And Crypto Processor Interface Shown In Interface Control Device 910 ...................................................................................2

B. SPEX Has Produced Evidence Showing That The Accused Products Include The Equivalent Of The "PCMCIA"-Labeled Boxes Of Interface Control Device 910 ...................................................................................7

C. Mr. Gomez's Opinion Is Consistent With The Court's Construction Of "Defined Interaction" And The Agreed Construction Of The "Target Means" Claim Element...................................................................................9

D. SPEX Has Shown That Data "Must First Pass Through" The "Security Means" As Required By The Recited Function Of The "Means For Mediating" Claim Element ...................................................................14

E. Apricorn Engages In Claim Construction To Change The Plain Meaning Of The Recited Function Of The "Means For Mediating" Claim Element .......17

F. The Court Must Reject Apricorn's Imported Limitation That The "Security Mean" And "Means For Mediating" Claim Limitations Must Be Separate, Distinct Computer Chips...............................................................................19

G. Apricorn's Imported Limitation Into The "Means For Operably Connecting" Limitation Is Wrong As A Matter Of Claim Construction. Even If Correct, SPEX Has Shown Infringement Under Apricorn's New Construction As Well .......................................................................23

IV. CONCLUSION...................................................................................25

RUSS, AUGUST & KABAT

# TABLE OF AUTHORITIES

**Cases**

*Al-Site Corp. v. VSI Int'l, Inc.*,
174 F.3d 1308 (Fed. Cir. 1999)..............................................7

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
340 F.3d 1298 (Fed. Cir. 2003)..............................................13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................2

*Brilliant Instruments, Inc. v. GuideTech, LLC*,
707 F.3d 1342 (Fed. Cir. 2013)..............................................2

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
145 F.3d 1303 (Fed. Cir. 1998)..............................................8

*Dow Chem. Co. v. United States*,
226 F.3d 1334 (Fed. Cir. 2000)..............................................4

*Epistar Corp. v. ITC*,
566 F.3d 1321 (Fed. Cir. 2009)..............................................18

*Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*,
362 F.3d 1367 (Fed. Cir. 2004)..............................................4

*Hamilton v. State Farm Fire & Cas. Co.*,
270 F.3d 778 (9th Cir. 2001)..............................................21

*Intel Corp. v. U.S. Itern. Trade Comm'n*,
948 F.2d 821 (Fed. Cir. 1991)..............................................4

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000)..............................................2

*Samuel Gart v. Logitech, Inc.*,
254 F.3d 1334 (Fed. Cir. 2001)..............................................2

*SRI Int'l v. Matsushita Elec. Corp.*,
775 F.2d 1107 (Fed. Cir. 1985)..............................................2

*Texas Instruments, Inc. v. Cypress Semiconductor Corp.*,
90 F.3d 1558 (Fed. Cir. 1996)..............................................8

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016)..............................................23

**Statutes**

35 U.S.C. § 112 ¶6 ..............................................7

**Rules**

FED. R. CIV. P. 56 ..............................................2

RUSS, AUGUST & KABAT

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

## I.   __INTRODUCTION__

There is more than sufficient evidence in the record to prove SPEX's infringement claims, including the opinion of SPEX's expert, the testimony of percipient fact witnesses, and the opinion of Apricorn's own expert. In its Motion for Summary Judgment of Noninfringement (D.I. 93) (the "Motion" or "Mot."), Apricorn ignores or distorts the evidence in the record (and the Court's claim constructions) to argue that summary judgment is appropriate.

Betraying the weakness of its arguments, Apricorn brings no less than ***seven*** bases for summary judgment. Most of Apricorn's arguments are little more than attorney argument without analysis of the actual evidence of record or legal support. For example, Apricorn argues that it is entitled to summary judgment because, according to Apricorn, there is no evidence that data stored by the accused products "must first pass through" the security means before being stored. Despite Apricorn's representation, not only did Mr. Gomez, SPEX's expert, opine that this limitation was met by the accused products and identify evidence to support his opinion (thereby creating a genuine dispute of material fact), but Apricorn's corporate representative (Mr. Younggren), Apricorn's expert (Dr. Jones), and Apricorn's chip manufacturer all testified that data must pass through the security means in the accused products before being stored. There is certainly at least a genuine issue of material fact as to whether the "must first pass through" limitation is met by the accused products.

As another example, many of Apricorn's arguments are based on importing limitations into already construed claim limitations. None of Apricorn's newly proposed limitations were raised during claim construction. More importantly, Apricorn's new imported limitations are inconsistent with the plain meaning of the terms, and Apricorn has failed to identify any clear and unambiguous disclaimer importing the limitations into the claims.

RUSS, AUGUST & KABAT

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUSS, AUGUST & KABAT

Because there are genuine disputes of material fact for all of Apricorn's arguments, the Motion must be denied.

## II.   **LEGAL STANDARD**

Summary judgment of non-infringement may only be granted if, after viewing the facts in the light most favorable to the patentee, there is no lingering genuine issue as to whether the accused instrumentality is covered by the asserted claims. *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1348–49 (Fed. Cir. 2013); FED. R. CIV. P. 56. "The movant bears the burden of demonstrating absence of all genuine issues of material fact." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985). "[T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

"[T]he court must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). Because "infringement is itself a fact issue" and summary judgment denies the patentee its day in court, a district court must approach a motion for summary judgment of non-infringement "with a care proportioned to the likelihood of its being inappropriate." *SRI Int'l*, 775 F.2d at 1116. Even where the structure or process of the accused instrumentality is undisputed, genuine issues of material fact often remain that preclude summary judgment. *See, e.g., Samuel Gart v. Logitech, Inc.*, 254 F.3d 1334, 1344 (Fed. Cir. 2001).

## III.   **ARGUMENT**

### A.   **To The Extent Necessary, SPEX Has Produced Evidence That The Accused Apricorn Products Include A Connection Between The Configuration Registers And Crypto Processor Interface Shown In Interface Control Device 910**

2

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Russ, August & Kabat

Apricorn is wrong in arguing that there is no evidence in the record that the configuration registers in Interface Control Device 910 are connected to the crypto processor interface. The testimony from relevant fact witnesses knowledgeable about Apricorn's accused products shows that the accused products use configuration registers to control the functionality of the accused products, including whether the encryption block (and the operative connection to the Crypto Processor Interface shown in Fig. 9B) is enabled or disabled. *E.g.*, Ex. A, Ko Tr. at 56:20-57:10 (testifying that configuration registers are used to control the functionality of the chips in the accused products), 94:1-8 (same), 81:11-82:24 (testifying that the chip can be configured to disable the encryption functionality); Ex. B, Younggren Tr. at 98:16-99:25 ("[t]here are configuration registers in the accused devices").[1] Because the configuration registers control the various components of the chips, they are necessarily connected to, *inter alia*, the crypto processor interface consistent with Interface Control Device 910.

Mr. Gomez, SPEX's technical expert, further opined that the accused products include all of the elements of Interface Control Device 910, including the connection between the configuration registers and the cryptographic processor. Ex. 2, Gomez Inf. Rep. ¶¶156 ("All of the elements shown in interface control device 910 shown in Figure 9B of the '802 patent are found in the accused products," further noting that configuration registers can be found in the USB component).

; *see also id.* ¶¶68, 72, 161, 171. This evidence is

---

[1] All lettered exhibits are attached to the concurrently filed declaration of Andrew D. Weiss. All numbered exhibits refer to exhibits attached to Apricorn's motion.

SPEX'S OPPOSITION TO APRICORN'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

1    sufficient to support a jury verdict that the Apricorn accused products have a

2    structure equivalent to the Interface Control Device 910 (as shown in Fig. 9B).

3        Even Apricorn's expert, Dr. Jones, does not dispute that the structure of

4    Interface Control Device 910 is found in the accused products. Dr. Jones' non-

5    infringement opinion is limited to three disagreements: (1) whether the recited

6    function is practiced by the accused products (Ex. C, Jones Reb. Rep. ¶127); (2)

7    whether the means for mediating must be a distinct chip on a circuit board (addressed

8    below) *id.* ¶126); and (3) whether additional, unclaimed functionality can prevent

9    infringement (it cannot) (*id.* ¶¶141-42). Mr. Jones did ***not*** opine that the accused

10   products did not have a connection between the configuration registers and the

11   cryptographic processor.

12       To show infringement of this claim element, SPEX must show that the

13   accused products have the corresponding structure or their equivalents. As shown

14   above, SPEX has put forward substantial evidence that the accused products have

15   structure that corresponds, or is equivalent, to an Interface Control Device 910.

16   Whether the structures identified in the accused products correspond, or are

17   equivalent, to the Interface Control Device 910 are questions of fact for the jury.

18   *Intel Corp. v. U.S. Itern. Trade Comm'n*, 948 F.2d 821, 841 (Fed. Cir. 1991) ("The

19   determination of literal infringement is a question of fact . . . as is the determination

20   of equivalent structure under 35 U.S.C. § 112, paragraph 6."); *Dow Chem. Co. v.*

21   *United States*, 226 F.3d 1334, 1338 (Fed. Cir. 2000) (the issue of "comparing the

22   properly construed claims to the device [or process] accused of infringing" is a

23   "factual determination"); *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*,

24   362 F.3d 1367, 1379 (Fed. Cir. 2004) (vacating summary judgment of no

25   infringement because patentee presented expert testimony creating an issue of

26   material fact as to whether the accused product infringed claim).

27       Apricorn's argument that Mr. Gomez admitted that the configuration registers

28   were not connected to the cryptographic processor interface takes Mr. Gomez's

4

RUSS, AUGUST & KABAT

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

testimony out of context, thereby altering its meaning. In the single question-and-answer cited by Apricorn, Mr. Gomez was asked whether Figure 9B (not the accused products) showed a path for data that did not include the cryptographic processor, *i.e.,* that showed data being stored without first being encrypted. Mot. at 5 (citing Ex. 3, Gomez Tr. at 225:20-226:7). The question had nothing to do with the accused products. Ex. D, Gomez Tr. at 222:17-225:19 (showing that the questioning was about what Fig. 9B shows, and not the accused products). In a somewhat confusing exchange, Mr. Gomez did not answer the question, and simply noted that "there is a line" from the configuration registers to the cryptographic processor interface, but explained that Apricorn did not "perform that function [(*i.e.*, store **unencrypted** data)] or use that in that way [(*i.e.*, **bypass encryption**)]." Mot. at 5; *see also* Ex. 2, Gomez Inf. Rep. ¶152 ("[t]he Apricorn configuration scheme does not provide for any alternative means for data to be stored on the storage media without first passing through the security means."). When read in context, this is not an admission that the accused products lack a connection between the configuration register and crypto processor interface. It is simply a statement that all the data in the accused products is encrypted before storage, consistent with the recited function of the "means for mediating" limitation. Indeed, to ensure that there was no confusion, Mr. Gomez later clarified his testimony: "And my point was that this – these – this structure as defined in 9B is incorporated in the Apricorn devices, and that the – therefore the Apricorn devices actually infringe because they incorporate the structure…. The other point I was trying to make was that all of the data passes through the crypto processor interface and that there's no use of an alternative path." Ex. D, Gomez Tr. at 280:7-281:13. Considered in its proper context, Mr. Gomez's testimony is hardly the damaging "admission" that Apricorn claims it to be.

Moreover, even ignoring the evidence that the accused products include all of the elements of Interface Control Device 910, including the connection between the configuration registers and the cryptographic processor, Apricorn's argument based

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

on the "local data" line is misplaced. The Court's claim construction refers to the "Interface control device 910 (as shown in Fig. 9B)" as the corresponding structure for the function of "mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means." D.I. 62 at 51. The Court's construction makes no reference to "local data," or any specific structure for "local data," and nothing in the specification refers to the line, or even suggests that "local data" is necessary for the required function of mediating the communication of data between the host and target to ensure that it first pass through the security means. As long as the components and the relationship depicted in Interface Control Device 910 are present in the accused products, and they perform the recited function, they infringe this claim element as construed by the Court.

Apricorn also argues that SPEX has "treated element 911 [the configuration registers] as if it were generic configuration registers in isolation rather than specific configuration registers arranged as required in Figure 9B." Mot. at 6. As shown above, this is not true. SPEX has put forth evidence and expert opinion showing that the accused products have configuration registers throughout the accused products, and that they control relevant aspects of the accused products, including whether encryption is enabled and how the device identifies itself to a host computer. Indeed, this is the type of functionality of the configuration registers that the Court specifically identified as important. D.I. 62 at 37 (noting the disclosure in the specification that "the content of the configuration registers enables the interface control device to present to the host computing device a desired identification of the peripheral device, and determines whether data passing through the peripheral device must be subjected to security operations." (quoting '802 patent at 17:25-36)). Block diagrams such as Fig. 9B of the '802 patent, or the block diagrams of the chips used in the accused products reproduced below, are ***logical*** diagrams of electronics—not ***physical*** ones. *See* Ex. E, Jones Tr. at 183:23-184:2 (Apricorn's

6

RUSS, AUGUST & KABAT

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

expert noting that block diagrams of the chips used by the accused products are just representations of the logical, not physical, connections); Ex. D, Gomez Tr. at 58:24-66:2 (noting the differences between block diagrams, and physical layouts). As long as the accused products include configuration registers as described in the specification (or their equivalents) as part of Interface Control Device 910 and the relationships between components shown in Interface Control Device 910, the accused products infringe. SPEX has produced evidence to meet this limitation.

Accordingly, SPEX has put forth more than sufficient evidence showing that the accused products infringe the "means for mediating…" claim element. Mr. Gomez did not testify, voluntarily or otherwise, that the accused products do not meet all of the requirements of Interface Control Device 910. And, regardless of his testimony, there is substantial evidence in the record to create a genuine dispute of material fact. Apricorn's Motion on this point must be denied.

**B.    SPEX Has Produced Evidence Showing That The Accused Products Include The Equivalent Of The "PCMCIA"-Labeled Boxes Of Interface Control Device 910**

Apricorn argues that it is entitled to summary judgment because Mr. Gomez "mistakenly opines that Apricorn's accused products literally include these 'PCMCIA' components." Mot. at 8-10. Mr. Gomez never rendered any such opinion, and Apricorn mischaracterizes Mr. Gomez's report. Instead, Mr. Gomez opined that PCMCIA is equivalent to USB here, and that USB discloses the same interface and buffers as disclosed in Interface Control Device 910.

An accused device can be found to infringe if it uses a structural equivalent under 35 U.S.C. § 112 ¶6, or an equivalent of the claim limitation under the doctrine of equivalence. *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1316 (Fed. Cir. 1999) ("A structure is equivalent for purposes of § 112 ¶6 (a 'structural equivalent') 'when the differences between the structure in the accused device and any disclosed in the specification are insubstantial.'" (quoting *Chiuminatta Concrete Concepts, Inc. v.*

RUSS, AUGUST & KABAT

7

1  *Cardinal Indus., Inc.*, 145 F.3d 1303, 1309 (Fed. Cir. 1998)); *Texas Instruments, Inc.*

2  *v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1566 (Fed. Cir. 1996) (application

3  of the doctrine of equivalents similarly "rests on the substantiality of the differences

4  between the claimed and accused products or processes" and often involves the

5  application of the "function, way, result test").

6  Consistent with the law, Mr. Gomez specifically opined that the "USB

7  interface is a structure equivalent to a PCMCIA interface" because it provides the

8  same function in the same way "through the use of defined behaviors and other

9  substructures including…I/O controllers, [and] address and data buffers." Ex. 2,

10  Gomez Inf. Rep. ¶¶125, 138-39.[2] In paragraphs specific to the "means for mediating"

11  element, Mr. Gomez provides more specific information with respect to how the

12  equivalent of the "PCMCIA"-labeled structures in Interface Control Device 910 are

13  used in the accused products' implementation of USB. *E.g.*, *id.* ¶¶

14  

15  

16  , 158 (noting PCMCIA blocks, and opining that the accused

17  products "contain a host computing device interface, a USB 3.0 (INIC-3706) and

18  USB 2.0 (INIC-1806) interface, as I have described above [referring to the section

19  of his report including paragraph 125]"),

20  

21  

22  , 163-65 (discussing the data and address buffers in more detail,

23  including a comparison of the similarities between the address buffers in PCMCIA

24  and USB),

25  .

26  

27  
28  ────────────────

[2] Apricorn's argument that "SPEX's expert report does not offer an opinion of
structural equivalents for these components" (Mot. at 9) is simply mistaken.

RUSS, AUGUST & KABAT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS, AUGUST & KABAT

Further, Apricorn's own witnesses, and the corporate representative of Apricorn's chip manufacturer, Mr. Ko, support Mr. Gomez's opinion that the accused products contain the equivalent of the "PCMCIA"-labeled elements. Mr. Ko, for instance, acknowledged that there are buffers in the USB interface, including a data buffer, and a command buffer, and that address and control information are transmitted across the USB interface, just as is shown in Interface Control Device 910. Ex. A, Ko Tr. at 52:4-54:1, 91:16-92:9, 101:15-102:6; *see also id.* at 68:3-9 ("data and command buffers are in the USB core block"). Apricorn's Mr. Younggren similarly acknowledged the USB interface passed addressing information, control or setup information, and data. Ex. B, Younggren Tr. at 96:5-98:4. Apricorn's expert, Dr. Jones, also agreed at deposition that USB was designed to replace PCMCIA as the mechanism for connecting devices to a computer. Ex. E, Jones Tr. at 196:6-198:21.

Accordingly, substantial evidence, including from Apricorn's own witnesses, supports that USB is the equivalent of PCMCIA, creating a genuine question of material fact. Apricorn's Motion on this point must be denied.

## C.    Mr. Gomez's Opinion Is Consistent With The Court's Construction Of "Defined Interaction" And The Agreed Construction Of The "Target Means" Claim Element

Apricorn is wrong to argue that Mr. Gomez's infringement opinion contradicts the Court's claim construction for the "target means" claim element. Mot. at 10-13. Substantial evidence shows that the "defined interaction" requirement of the asserted claims is satisfied by each of the accused Apricorn products. The Court construed "defined interaction" as "an interaction [with a host computing device] that can provide one more of a variety of functionalities." D.I. 62 at 10. The Court construed "interaction" according to its plain meaning, which is simply a "communication." Ex. F (https://www.lexico.com/en/definition/interaction).

9

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

SPEX has shown that the accused products perform the recited function of "enabling a defined interaction with a host computer device." SPEX has shown that there are communications (*i.e.*, interactions) between the accused products and host computing devices that provide one or more of a variety of types of functionality. For instance, Mr. Gomez opines that the accused products perform an interaction (*e.g.*, transferring data such as USB class codes to inform the host computer of the device's capabilities) to provide functionality (*e.g.*, the storage of data). Ex. 2, Gomez Inf. Rep. ¶¶214 ("use of the Apricorn products will result in the devices providing to the host information regarding the type of defined interaction in response to the request from the host computing device"), 101-02, 139; *see also* Ex. D, Gomez Tr. at 168:14-20 ("So the firmware in the Apricorn -- or in the Apricorn products, including the Initio chips, will respond to a request for what the defined interaction is. And in doing so, the host is then informed that it's a storage device."), 169:1-17 ("So in the USB protocol, there's a means to be able to return different class codes. And, you know, one of those class codes is a storage medium."), 258:14-259:18 ("So in the defined interaction it's going to provide information about the storage element or the mass storage device. And as part of the request for information, one of the things is the class code that's returned in the device descriptor.").

Further, testimony from Roy Younggren, Apricorn's Vice President of Engineering and 30(b)(6) designee, confirms Mr. Gomez's opinions that the accused products interact with a host computing device to identify themselves, thereby enabling the functionality of storage of data. Ex. B, Younggren Tr. at 40:12-43:11.

Likewise, documents in the record confirm that the accused products satisfy the "defined interaction" requirement. For instance, the USB specification, which the accused products comply with, provides that "[a] USB device must be configured before its function(s) may be used," "the [h]ost typically requests configuration information from the USB device to determine the device's capabilities," and the

10

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

information provided in response to the request may include a class code, which is "information that is used to identify a device's functionality," and which includes, for example, the functionality of "mass storage." Ex. G, USB 1.1 Specification at SPEX00074389; Ex. H (https://www.usb.org/defined-class-codes).

The admissions of Apricorn's fact witnesses, documents in the record, and Mr. Gomez's opinions all confirm that the accused products communicate with host devices to identify themselves as, *inter alia*, storage devices, and through that interaction, provide one or more of a variety of types of functionality, including data storage. These undisputed facts are consistent with the examples of a "defined interaction" in the Court's claim construction order. Crediting SPEX's expert, the Court recognized that the claims and specification use the term "defined interaction" to "define the types of functionality within which a product would operate and convey that information to the host computer," D.I. 62 at 10, which is undisputedly consistent with how the accused products operate.

At a minimum, the current record raises a disputed issue of material fact that precludes summary judgment. The evidence would support a jury verdict that the accused products meet the "defined interaction" limitation because they have communications (*i.e.*, interactions) with the host computer to provide one or more functionalities consistent with the claims and the Court's claim construction.

Despite the record evidence, Apricorn brings two arguments in support of its Motion. First, Apricorn seems to argue that Mr. Gomez's opinion is not sufficient because USB class codes are not a defined interaction. Mot. at 11-12. However, the use of identifiers, such as class codes, to define the functionality of a peripheral device to a host computer has already been expressly endorsed by the Court as "consistent with how the patent claims and specification use the term 'defined interaction.'" D.I. 62 at 9-10. Mr. Gomez's opinion is therefore consistent with the construction of "defined interaction." *See* Ex. D, Gomez Tr. at 278:10-16 ("Q Okay. And what about the defined interaction as it relates to the target means, what was

11

RUSS, AUGUST & KABAT

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

your understanding of that? [A] That it just provide information about the type of --
or the functionality that is being provided." (objection removed)). Furthermore,
Apricorn's expert, Dr. Jones, also did not opine that Mr. Gomez did not identify a
defined interaction. Instead, Dr. Jones opined that the Court's claim construction
requires an infringing device have multiple functionalities (it does not), and that the
recited function requires that the memory element actively communicate with the
host computer (it also does not, as discussed below). Ex. C, Jones Reb. Rep. ¶¶84-
85; Ex. E, Jones Tr. at 174:20-176:10.

With respect to the second argument, Apricorn argues that it does not infringe
the "target means" claim element because "Apricorn's accused products use a
different protocol to communicate with a host computing device (USB) than the
protocol used to provide for data storage (NAND flash drive interface or SATA
interface)." Mot. at 12-13. Nothing in the construction of the "target means" or
"defined interaction" claim limitations requires that the protocol used by the host
computer interface be the same as the protocol for the target means interface.
Apricorn's proposed imported limitation is further inconsistent with the intrinsic
evidence, which includes a preferred embodiment where the host interface protocol
(*e.g.*, PCMCIA) is different than the target means protocol (*e.g.*, Compact Flash).
*E.g.*, Ex. I, '802 patent at Fig. 9B, 17:18-21 ("the host computing device
communicates via PCMCIA interface and the target functionality is embodied by a
compact flash memory device"), 5:5-10 (disclosing examples of host interfaces
including PCMCIA, RS-232, wireless communications, and smart card protocols),
13:31-38 (disclosing that memory module can use, for example, NAN flash memory,
Compact Flash, SCSI or IDE protocols).[3]

---

[3] To the extent Apricorn is arguing that the Court's construction of "defined
interaction" requires a ***direct*** interaction between the host computer and the target
means, this argument is flawed for the same reasons as Apricorn's multiple
protocols argument is flawed. It imports a limitation that conflicts with the intrinsic
evidence, and the agreed construction.

12

RUSS, AUGUST & KABAT

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

In a footnote, Apricorn also argues that memory are "passive components" and therefore cannot infringe the "target means" claim limitation. Mot. at 13 n.2. The fact that Apricorn buries this argument in a footnote underscores its weakness. Apricorn's footnote is based solely on attorney *ipse dixit*. Mr. Gomez identifies flash memory, solid state disks and rotating disks as the corresponding structures. Ex. 2, Gomez Inf. Rep. ¶¶98-100. The '802 patent specification specifically identifies these types of memory as examples of the target means. Ex. I, '802 patent at 13:27-38 (referring to, *inter alia*, "flash memory," "solid-state disk[s]," "SCSI disks," and "IDE disks"). The memory performs the recited function because the memory makes it possible for the Accused Devices to act as mass storage devices. Ex. 2, Gomez Inf. Rep. ¶¶98-102. Apricorn's argument that such memory cannot by its very nature enable a defined interaction would impermissibly read out exemplary embodiments from the '802 patent. *See, e.g., Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003).[4]

Nor is there any support in the claim construction for Apricorn's contention that a "passive" target means cannot "enable" a defined interaction. The Court did not construe "enabling." As such, it is construed according to its ordinary meaning: "to make possible" or "to provide with the means or opportunity." Ex. J, (https://www.merriam-webster.com/dictionary/enable). "Enabling a defined interaction" does not mean that the target means has to **actively** enable the defined interaction. Enabling only requires making an action possible. That memory is present in the accused products certainly makes it possible for the host to be

---

[4] Apricorn's argument is also inconsistent with the parties' agreed upon construction for "target means." Apricorn agreed that the structure of "target means" includes "[a] memory module adapted to enable non-volatile storage of data," and expressly referred to "flash memory," "solid-state disk[s]," "SCSI disks," and "IDE disks," as intrinsic support. D.I. 41 at 38-40. The Court should reject Apricorn's attempt to argue that structure it previously agreed as satisfying the "target means" limitation cannot now do so because it is supposedly "passive."

13

RUSS, AUGUST & KABAT

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   informed that the accused product is a storage device capable of performing the

2   function of storing data.

3       As shown above, when properly considered without Apricorn's improperly

4   imported limitations, the accused products infringe the "target means" claim

5   element. Because SPEX has put forth substantial evidence to show that the "target

6   means" element as construed by the Court is infringed, this portion of Apricorn's

7   argument must be denied.

8       **D.   SPEX Has Shown That Data "Must First Pass Through" The**

9       **"Security Means" As Required By The Recited Function Of**

10      **The "Means For Mediating" Claim Element**

11      For the "means for mediating" claim element, SPEX has shown both that the

12  accused products perform the recited function, and that the accused products include

13  the corresponding structure (Interface Control Device 910 or its equivalent). With

14  respect to the recited function, Mr. Gomez opined that the configuration of the

15  Apricorn accused products "ensures that all data must first pass through the security

16  means before it is stored on the storage media." *E.g.*, Ex. 2, Gomez Inf. Rep. ¶¶152-

17  55 (citing to relevant testimony). Mr. Gomez's opinion is supported by the testimony

18  of Apricorn (through Mr. Younggren) as well as the testimony of Mr. Ko, the

19  corporate representative of Apricorn's chip manufacturer. Ex. B, Younggren Tr. at

20  32:11-33:11 ("all data that is stored in the storage medium in the accused products

21  is encrypted"; "no data is written to the storage medium without it first being

22  encrypted"; further testifying that the encryption of user data is automatic and

23  transparent to the end-user); Ex. A, Ko Tr. at 72:5-73:25 ("data cannot flow from

24  the FIFO to the NAND flash controller without going through the AES block"),

25  77:22-78:2 ("Q And that data is all encrypted; is that right? A Uh-huh. Q And that

26  encrypted data is written to the memory module? A Uh-huh.").

27      With respect to the corresponding structure of Interface Control Device 910,

28  Mr. Gomez opined in great detail about how the structures in the Interface Control

RUSS, AUGUST & KABAT

14

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

Device 910 correspond to the structures in the accused products. *E.g.*, Ex. 2, Gomez Inf. Rep. ¶¶156-80 (citing to numerous documents and testimony). With respect to the particular connection highlighted by Apricorn, Mr. Gomez specifically opined as to how the data buffer in the accused products is connected to the AES encryption block. *E.g.*, *id.* ¶¶

. *E.g.*, Ex. A, Ko Tr. at 72:11-73:73:13; *see also* Ex. E, Jones Tr. at 184:11-185:4. This is shown in the image below by the red arrows. All data to be written to the NAND Flash must pass through the AES encryption module first. *See* Ex. A, Ko Tr. at 64:24-65:5 (the double-sided arrows represent the flow of data). The green arrows show the flow of the (now encrypted) data out of AES block and into NAND Flash memory for storage.

SPEX'S OPPOSITION TO APRICORN'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT

1
2
3
4
5
6
7
8
9
10
11

RUSS, AUGUST & KABAT



Apricorn ignores the opinion of Mr. Gomez as well as the testimony of fact witnesses such as those cited by Mr. Gomez (Ex. 2, Gomez Inf. Rep. ¶¶153-55) to counterfactually argue that SPEX has failed to show evidence that the accused products must first pass data through the security means to be encrypted. This argument is simply untrue, and, even more importantly, is contradicted by *all* of the evidence in the record. Indeed, as discussed with respect to Apricorn's first argument above, even Dr. Jones, Apricorn's expert, does not dispute that the accused products perform the recited function. Ex. C, Jones Reb. Rep. ¶¶126-27, 141-42 (expressing only three opinions as to why the "mean for mediating" element is purportedly not infringed which do not support this argument).

Apricorn also appears to argue that the Court found in claim construction that a portion of the recited function ("must first pass through") corresponds to a specific portion of Interface Control Device 910 (the line highlighted red in Apricorn's motion). Mot. at 14-15 ("the corresponding structure of Interface control device 910 (as shown in Fig. 9B) of the '802 patent that ensures data 'must first pass through' the AES block."). The Court made no such finding, and there is no precedent for engaging in means-plus-function claim construction of only subparts as argued by

16

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

Apricorn. Further, there is no factual support for Apricorn's argument. There is nothing in the specification of the '802 patent that supports that the line highlighted by Apricorn, without more, is the corresponding structure of the "must first pass through" portion of the recited function. And neither Mr. Gomez nor Dr. Jones rendered such an opinion either.

Accordingly, SPEX has shown that the accused products include both the recited function and corresponding structure of the "means for mediating" claim element, and this portion of Apricorn's motion must be denied.

### E.     Apricorn Engages In Claim Construction To Change The Plain Meaning Of The Recited Function Of The "Means For Mediating" Claim Element

Apricorn next argues that it is entitled to summary judgment because the recited function of "mediating communication between the host computer device and the target means so that communication must first pass through the security means" requires that data "does not pass through other elements of the means for mediating (910) before going to the security means through the crypto processor interface." Mot. at 16-19. In other words, Apricorn is arguing that Apricorn's characterizations of the limitations of the corresponding structure be imported as limitations of the recited function. Legally, Apricorn cites no support for its novel argument, and it must be rejected for this reason alone. Apricorn's argument fails for other reasons as well.

First, Apricorn's argument is inconsistent with the plain meaning of the recited function. The plain meaning of the recited function is that the means for mediating ensures that data passes through the security means ***before*** the data is stored. This is the plain and ordinary meaning of "must first pass through" as used in the recited function. The plain and ordinary meaning is also consistent with the plain meaning of the recited function, as the specification describes one of the purposes of the invention being to ensure that encryption occurs in a transparent,

17

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

"in-line" manner. *E.g.*, Ex. I, '802 patent at Fig. 8 (showing the interface control device (labeled 802) ensuring data is processed by the security means (labeled 801)), 3:40-45 ("The peripheral device can also be implemented so that the security operations are performed in-line, i.e., the security operations are performed between the communication of data to or from the host computer device and the performance of the defined interaction."), 3:59-64 ("Moreover, the provision of in-line security in a peripheral device according to the invention enables a more secure exchange of data between a host computer device and the peripheral device, overcoming the problems identified above in previous systems for performing security operations on data exchanged between such device."), 6:1-7 ("Additionally, the peripheral device 400 can be implemented so that security operations are performed "in-line," i.e., the security operations are performed between the communication of data to or from the host computer device and the performance of the target functionality provided by the peripheral device."), 16:52-56 ("The interface control device 802 also enables the in-line cryptography aspect of the invention, since the interface control device 802 controls the follow of data between the host computing device and the target functionality 807."), 16:61-17:6 ("The interface control device 802 presents the data to a cryptographic processing device interface 808…. The interface control device 802 then causes the data to be transferred to the target functionality 807.").

Conversely, Apricorn has failed to identify a clear and unambiguous disclaimer that the inventors intended to limit the recited function to requiring that data must pass through only specific aspects of the interface control device 910 before being stored. *See Epistar Corp. v. ITC*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (there is "a heavy presumption that claim terms carry their full ordinary and customary meaning" unless Apricorn can show clear and unambiguous disclaimer or a lexicographic definition by the inventors). Indeed, in their *inter partes* review petition, Apricorn argued (consistent with the plain meaning) that the recited function was met because "it would have been obvious to use the data encryption

18

RUSS, AUGUST & KABAT

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

module disclosed in [the prior art] to encrypt the data before storing it in memory in view of [the prior art's] disclosure of an encryption module on the mother card between the host computer and target memory device." Ex. K, '802 IPR Petition at 45.[5]

Second, to the extent Apricorn is again arguing that SPEX has not shown a connection between the data buffer and the cryptographic processor interface in the accused product, Apricorn's argument is wrong, as shown above in Section III.D. *See also* Ex. 2, Gomez Inf. Rep. ¶¶152 ("The Apricorn configuration scheme does not provide for any alternative means for data to be stored on the storage media without first passing through the security means."), 154 (identifying Mr. Younggren's testimony that "no data is written to the storage medium ***without it first being encrypted***" (emphasis added)), ████████████████████ ██.

Finally, even if Apricorn's imported limitation is accepted (which it should not be), Apricorn's argument rests on the assumption that there is in fact structure in the accused product between the data buffer and cryptographic processor. Apricorn has failed to identify any such structure in its Motion, and its expert did not even refer to this argument. *See also* Ex. C, Jones Reb. Rep. ¶¶126-27, 141-42 (Dr. Jones's expert report also fails to identify the additional structure Apricorn argues is present in the accused products)

Accordingly, this aspect of the Apricorn's Motion must be denied.

**F.    The Court Must Reject Apricorn's Imported Limitation That The "Security Mean" And "Means For Mediating" Claim Limitations Must Be Separate, Distinct Computer Chips**

---

[5] In other words, Apricorn made the same argument to the PTAB that it now argues is contrary to the meaning of the recited function.

19

RUSS, AUGUST & KABAT

1   Apricorn argues that SPEX has not shown infringement because the "security

2   means" and "means for mediating" claim limitations must be infringed by separate,

3   distinct computer chips within a single peripheral device. Mot. at 19-23. According

4   to Apricorn, because both of these claim elements are infringed by specific hardware

5   components within a ***single*** computer chip in the accused products, it cannot

6   infringe. *Id.*

7   There is no support within the intrinsic evidence (claims, specification, or file

8   history of the '802 patent) for this imported limitation. For example, Figures 8, 9A

9   and 9B are block diagrams of the invention (Ex. I, '802 patent at 4:38-44) that are

10   logical descriptions of the invention, not a PCB layout requiring that the "security

11   means" and "means for mediating" claim elements be separate, distinct computer

12   chips. *See* Ex. E, Jones Tr. at 183:23-184:2 (Apricorn's expert noting that block

13   diagrams of the chips used by the accused products are just representations of the

14   logical, not physical connections); Ex. D, Gomez Tr. at 58:24-66:2 (noting the

15   differences between block diagrams, and physical layouts). And, even if they were

16   PCB layouts, there is no clear and unambiguous disclaimer of products that have the

17   "security means" and "means for mediating" physically on the same chip. *See, e.g.*,

18   *Epistar*, 566 F.3d at 1334.

19   While the Court required that the "security means" consist of a "specific

20   hardware component," nothing in the construction required that the security means

21   be physically and functionally separate or a single-purpose component, or that it

22   could not reside on the same chip as other components. *See* D.I. 62 at 16-23.

23   Apricorn points to the Court's use of the word "interfaces" in the Order Regarding

24   Claim Construction (Mot. at 21) but nothing about the Court's use of the word

25   "interfaces" requires that the claims include the separate, distinct computer chip

26   limitation now asserted by Apricorn.

27   Apricorn's citations to the briefing and Order from the motion to dismiss

28   similarly do not support Apricorn's imported limitations. In the briefing on the

20

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

motion to dismiss, SPEX was pointing out that the claims were not abstract because they claimed a number of specific hardware components. *E.g.*, D.I. 27 at 1 ("The claims are directed to specific, concrete devices, not an abstract idea. For example, the peripheral device claimed by claim 11 of the '802 patent has five specific hardware components"), 7 ("The patents-in-suit claim specific machines implementing specific technology. The claims are not directed to an abstract idea."), 8 ("The claimed peripheral device has five specified hardware components"). SPEX never argued that any of the hardware components were separate, distinct computer chips, and such an argument was unnecessary to show that the claims of the '802 patent were not abstract.

Similarly, the Court's Order denying Apricorn's motion to dismiss did not find (or rely on) that the claims of the '802 patent required separate, distinct computer chips. D.I. 29-1 at 7-8 ("claim is tied to a specific structure, which is a peripheral device"; "claim 11 describes a physical structure that contains a combination of components"). To the extent Apricorn's argument is based on the word "component," the plain meaning of the word is that it refers to a part of a larger whole (here, a peripheral device), not that each claim limitation must be a separate, distinct computer chip.[6]

Apricorn's reliance in footnote 5 of the Motion on the testimony of SPEX's invalidity expert Miguel Gomez is similarly misplaced. Mr. Gomez could not and

---

[6] Because SPEX has never taken the position that "specific hardware components" requires discrete and physically separate components, judicial estoppel does not attach to these arguments. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) ("Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position."). Necessarily, estoppel does not attach to arguments that have never been raised. *Id.* Further, as SPEX has never presented the opinion at issue from Mr. Gomez's report to the Court or relied on it in filings, it is likewise not estopped by any implication that might be found from this statement. *Id.*

21

RUSS, AUGUST & KABAT

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

did not reinterpret the Court's construction to require physically and functionally separate security means and means for mediating. Rather, his comment was simply to explain that defendant Kingston's expert, in a related case, relied on a specific MYK-82 chip as the structure for both the "security means" and the "means for mediating" without specifically identifying hardware, circuits or silicon on the chip as the structure for either limitation. Ex. 6, Gomez Reb. Rep. at 59 n.20. Mr. Gomez did not opine that the security means and means for mediating required different chips.

Substantial evidence supports a finding that the accused products meet both the "security means" and "means for mediating" limitations. The evidence identifies "security means" in the accused products as a specific hardware component. *E.g.*, Ex. 2, Gomez Inf. Rep. ¶¶68 (showing an AES block), 72 (same), 87-88 (referring to an AES cryptographic controller); Ex. D, Gomez Tr. at 58:24-66:2;[7] Ex. B, Younggren Tr. at 15:8-11 (testifying that "a specific hardware component within the accused products that performs the security operations"); Ex. A, Ko Tr. at 45:3-7 (the AES encryption block is called an "engine" because it uses specialized hardware to perform the encryption). And, as discussed in further detail above, the evidence identifies other circuits for the required "means for mediating" structure. *E.g.*, Ex. 2, Gomez Inf. Rep. ¶¶68-73, 125, 138-39, 156-80; Ex. A, Ko Tr. at 52:4-54:1, 56:20-57:10, 68:3-9, 81:11-82:24, 91:16-92:9, 94:1-8, 101:15-102:6; Ex. B, Younggren Tr. at 96:5-98:4, 98:16-99:25; Ex. C, Jones Reb. Rep. ¶¶126-27, 141-42 (Dr. Jones did not rebut that the corresponding structure was present). There is therefore substantial

---

[7] Mr. Gomez notes the differences between functionality and physical design of circuitry. *Id.* As long as the functionality is separate, a person of ordinary skill in the art would understanding that they are specific hardware components. *Id.* The fact that a physical circuit design might necessitate some overlap (such as a shared clock or reset circuit) does not change the understanding of a person of ordinary skill.

RUSS, AUGUST & KABAT

evidence that the accused products meet the claim limitations as construed by the Court.

Accordingly, this portion of Apricorn's Motion should be denied.

### G. Apricorn's Imported Limitation Into The "Means For Operably Connecting" Limitation Is Wrong As A Matter Of Claim Construction. Even If Correct, SPEX Has Shown Infringement Under Apricorn's New Construction As Well

Apricorn's final argument seeks to import an "explicit instruction" limitation into the "means for operably connecting" limitation based on statements made in an *inter partes* review proceeding for a ***different, unrelated*** patent that was not a means plus function term. Mot. at 23-25. Apricorn's argument is based on statements made about the scope of claims in the U.S. Patent No. 6,003,135 (the "135 patent"), not the '802 patent. *Id.* While the '135 patent and the '802 patent share common inventors, the patents are not related as evidenced by the fact that there is no "Related U.S. Application Data" on the face of either patent. *Compare* Ex. I, '802 patent at Title Page *with* Ex. L, '135 patent at Title Page. Because the patents are not related, limitations from the '135 patent should not be imported into the '802 patent as argued by Apricorn. *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016) (overturning a district court's claim construction where it imported limitations from unrelated patents). As evidenced by the quotes in the Motion itself, Apricorn's cited cases, *Verizon* and *Microsoft*, considered statements from ***related*** patents, not ***unrelated*** patents as is at issue here. Mot. at 25. Moreover, the terms are different. The "means for operably connecting" term that appears in the '802 patent does not appear in the '135 patent method claims at issue in the IPR. Here, the Court's construction, as dictated by Section 112(6), found that the recited function is "operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device." D.I. 62 at 26-27. Because Apricorn has failed to cite to any

RUSS, AUGUST & KABAT

23

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

evidence from the '802 patent and its file history to support importing a limitation into the recited function for the means plus function term at issue here, Apricorn's argument to import limitations from the '135 patent into the '802 patent is inappropriate and must be rejected.

Apricorn's argument also fails because, even if the "explicit instruction" limitation were imported in this recited function, there is evidence in the record showing that the accused products do operably connect the security means or target means in response to an "explicit instruction" to operably connect the accused products. For example, Mr. Gomez described how the accused products receive instructions for detecting the presence of a device, and to provide various identifying information, which results in the accused products being operably connected to the host computer. Ex. 2, Gomez Inf. Rep. ¶¶127-30 (citing evidence supporting his opinion, including the testimony of fact witnesses). Mr. Gomez also provided additional details regarding the explicit instructions that meet this recited functionality. *Id.* ¶¶134 ("The USB specification requires a host driver to interrogate the peripheral device and the peripheral device must respond in order for communications to be set up corresponding to a class type of the peripheral device."), 133 ("A device shall be configured before its functions can be used. The host is responsible for configuring a device. The host typically requests configuration information from the device to determine its capabilities" and "In support of adaptive device drivers that are capable of managing a related group of devices, the device and interface descriptors contain Class, SubClass and Protocol Fields."); Ex. M, Gomez Inf. Rep. at ¶236 ("After the device descriptor is read by the host, the host issues a command to read configuration information about the device…. Once the device has been configured, '[f]rom the device's point of view it is now ready for use.' SPEX00074388.").

Other evidence in the record also confirms Mr. Gomez's opinion. Mr. Younggren admitted, for example, that the accused products respond to USB

commands. Ex. B, Younggren Tr at 129:20-130:1. And the USB specification confirms that explicit instructions are used. *See* Ex. G, USB 1.1 specification at SPEX00074388 (step 7: 'The host reads the configuration information from the device by reading each configuration zero to n-1, where n is the number of configurations.'), SPEX00074395 (describing Standard Device Requests, including 'GET_CONFIGURATION'); *see also* Ex. B, Younggren Tr. at 36:19-37:5 (the accused products adhere to the USB specifications). Indeed, during deposition, Apricorn admitted, consistent with the opinion of Mr. Gomez, that the accused products respond to USB commands. Ex. B, Younggren Tr. at 129:20-130:1.

Accordingly, the Court should reject Apricorn's final argument because it is inconsistent with both the Court's claim construction, and is contradicted by Mr. Gomez's testimony and other evidence.

## IV.   **CONCLUSION**

None of Apricorn's seven arguments show a lack of genuine dispute of material fact. Indeed, for the many of the arguments, the only evidence in the record supports SPEX's infringement claims. The Motion must therefore be denied.


Respectfully submitted,

DATED: September 16, 2019                    RUSS, AUGUST & KABAT


                                           */s/ Andrew D. Weiss*
                                            Andrew D. Weiss


                                           RUSS, AUGUST & KABAT
                                           Marc A. Fenster, SBN 181067
                                           mfenster@raklaw.com
                                           Ben Wang, SBN 228712
                                           bwang@raklaw.com
                                           Andrew D. Weiss, SBN 232974
                                           aweiss@raklaw.com


                                           Attorneys for Plaintiff
                                           **SPEX TECHNOLOGIES, INC.**

25

RUSS, AUGUST & KABAT

*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Civil Rule 5-3.3 and 5.4

Dated: September 16, 2019

*/s/ Andrew D. Weiss*
Andrew D. Weiss

RUSS, AUGUST & KABAT

SPEX'S OPPOSITION TO APRICORN'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT