CHRISTOPHER D. BRIGHT
(SBN 206273)
christopher.bright@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
600 Anton Boulevard, Ste. 1800
Costa Mesa, California  92626
Telephone:  714.830.0600
Facsimile:   714.830.0700

HERSH MEHTA
(*admitted pro hac vice*)
hersh.mehta@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois  60601
Telephone:  312.324.1739
Facsimile:   312.324.1001

*Attorneys for Defendant,*
APRICORN

MICHAEL J. LYONS
(SBN 202284)
michael.lyons@morganlewis.com
CARLA B. OAKLEY
(SBN 130092)
carla.oakley@morganlewis.com
AHREN C. HSU-HOFFMAN
(SBN 250469)
ahren.hsu-hoffman@morganlewis.com
EHSUN FORGHANY
(SBN 302984)
ehsun.forghany@morganlewis.com
THOMAS Y. NOLAN
(SBN 312025)
thomas.nolan@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1400 Page Mill Road
Palo Alto, CA 94304
Telephone:  650.843.7226
Facsimile:   650.843.4001

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPEX TECHNOLOGIES, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>APRICORN,<br><br>    Defendant. | CASE NO.: 2:16-CV-07349 JVS (ARGx)<br><br>Hon. James V. Selna<br><br>**DEFENDANT APRICORN'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS RENEWED MOTION UNDER RULE 50(b) FOR JUDGMENT AS A MATTER OF LAW OF NO INFRINGEMENT AND ALTERNATIVELY FOR A NEW TRIAL UNDER RULE 59** |

# **TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................... 1

II. BACKGROUND ............................................................................ 2

III. LEGAL STANDARD ..................................................................... 2

IV. NO LEGALLY SUFFICIENT EVIDENCE THAT THE ACCUSED PRODUCTS INCLUDE THE "MEANS FOR MEDIATING" .................... 3

 A. There Was No Legally Sufficient Evidence That The Accused Products Perform The Function Of The "Means For Mediating" ........ 4

  1. PHE Precludes Applying The DoE To the "Means for Mediating" Limitation ................................................. 7

  2. Applying DoE To The Accused Products Would Vitiate The Required Function Of The "Means For Mediating" ......... 10

 B. There Was No Legally Sufficient Evidence That The Accused Products Include ICD 910 Or An Equivalent ................................... 11

  1. Literal infringement is precluded as a matter of law because the alleged equivalents are after-arising technology ................................................................ 15

  2. SPEX's component-by-component analysis failed to show an overall equivalent to ICD 910 ............................... 17

  3. There was no legally sufficient evidence of an equivalent structure because of "intermingling" of components. .............. 19

V. NO LEGALLY SUFFICIENT EVIDENCE OF A "MEANS FOR ENABLING COMMUNICATION BETWEEN THE SECURITY MEANS AND THE TARGET MEANS" ........................................................ 20

VI. NO LEGALLY SUFFICIENT EVIDENCE THE ACCUSED PRODUCTS WITH 3607 CHIPS INCLUDE A "SECURITY MEANS" ............................................................................... 22

VII. NO LEGALLY SUFFICIENT EVIDENCE THAT THE ACCUSED PRODUCTS INCLUDE A "TARGET MEANS" ....................................... 23

VIII. THE COURT SHOULD GRANT A NEW TRIAL ..................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Site Corp. v. VSI Int'l, Inc.*,
174 F.3d 1308 (Fed. Cir. 1999) .......................................................... 16

*Applied Med. Resources Corp. v. U.S. Surgical Corp.*,
448 F.3d 1324 (Fed. Cir. 2006) ............................................................ 7

*Avago Technologies General IP PTE Ltd. v. Elan Microelectronics
Corp.*,
No. C 04-05385 JW, 2009 WL 8612367 (N.D. Cal. Sept. 23, 2009) ................ 25

*Bennett Marine, Inc. v. Lenco Marine, Inc.*,
549 Fed. App'x 947 (Fed. Cir. 2013) .................................................. 19

*Conopco, Inc. v. May Dep't Stores Co.*,
46 F.3d 1556 (Fed. Cir. 1994) ............................................... 10, 19, 24

*Duramed Pharma., Inc. v. Paddock Labs., Inc.*,
644 F.3d 1376 (Fed. Cir. 2011) ............................................................ 9

*Ecolab, Inc. v. Paraclipse, Inc.*,
285 F.3d 1362 (Fed. Cir. 2002) ...................................................... 3, 24

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .......................................................... 15

*Felix v. Am. Honda Motor Co.*,
562 F.3d 1167 (Fed. Cir. 2009) ............................................................ 8

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002) ............................................................... 7, 8, 9

*Georgia-Pacific Corp. v. U.S. Gypsum Co.*,
195 F.3d 1322 (Fed. Cir. 1999) .......................................................... 24

*Georgia-Pacific Corp. v. U.S. Gypsum Co.*,
204 F.3d 1359 (Fed. Cir. 2000) .......................................................... 24

*Harris Corp. v. Ericsson Inc.*,
   417 F.3d 1241 (Fed. Cir. 2005) ................................................................ 2

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*,
   370 F.3d 1131 (Fed. Cir. 2005) (*en banc*) ............................................. 8

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
   751 F.3d 1327 (Fed. Cir. 2014) ............................................................... 2

*JVW Enters. v. Interact Accessories, Inc.*,
   424 F.3d 1324 (Fed. Cir. 2006) ............................................................... 4

*Kemco Sales, Inc. v. Control Papers Co., Inc.*,
   208 F.3d 1352 (Fed. Cir. 2000) ............................................................. 11

*L.B. Plastics, Inc. v. Amerimax Home Prods., Inc.*,
   499 F.3d 1303 (Fed. Cir. 2007) ............................................................... 9

*Murphy v. Long Beach*,
   914 F.2d 183 (9th Cir. 1990) ................................................................... 3

*Noah Sys., Inc. v. Intuit Inc.*,
   675 F.3d 1302 (Fed. Cir. 2012) ............................................................. 17

*Old Town Canoe Co. v. Confluence Holdings Corp.*,
   448 F.3d 1309 (Fed. Cir. 2006) ............................................................... 8

*Pioneer Magnetics, Inc. v. Micro Linear Corp.*,
   330 F.3d 1352 (Fed. Cir. 2003) ............................................................. 10

*Solomon Techs., Inc. v. Int'l Trade Comm'n*,
   524 F.3d 1310 (Fed. Cir. 2008) ................................................. 14, 15, 18

*Summers v. Delta Air Lines, Inc.*,
   508 F.3d 923 (9th Cir. 2007) ................................................................... 2

*Toro Co. v. Deere & Co.*,
   355 F.3d 1313 (Fed. Cir. 2004) ................................................. 14, 15, 18

*Unidynamics Corp. v. Automatic Products Intern., Ltd.*,
   157 F.3d 1311 (Fed. Cir. 1998) ............................................................. 15

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*,
   520 U.S. 17 (1997) ............................................................. 7, 10, 11, 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Statutes**

35 U.S.C. § 103 ................................................................................................... 8

35 U.S.C. § 112(6) ...................................................................................... *passim*

Defendant Apricorn hereby submits its memorandum in support of its renewed motion under Rule 50(b) for judgment as a matter of law ("JMOL") of no infringement and, in the alternative, for a new trial under Rule 59.

## I.   INTRODUCTION

Apricorn respectfully renews its motion for JMOL of no infringement because SPEX failed to submit sufficient evidence upon which a reasonable jury could rely to find infringement, either literally or under the doctrine of equivalents ("DoE"), of claims 11 or 12 (collectively, "the Asserted Claims") of U.S. Patent No. 6,088,802 ("the '802 patent" or "the Asserted Patent").  Specifically, SPEX submitted insufficient evidence to support the jury's verdict that Apricorn's accused products included each of the following four limitations of the Asserted Claims: (1) a "means for mediating," (2) a "means for enabling communication between the security means and the target means," (3) a "security means," and (4) a "target means for enabling a defined interaction with a host computing device."

For the "means for mediating," Apricorn's accused products do not perform the recited function because it is undisputed that not all data first passes through the security means and SPEX offered no evidence the accused structure mediates data in "substantially the same way" as the corresponding structure in the '802 patent. Prosecution history estoppel ("PHE") and the doctrine of claim vitiation preclude any infringement under the DoE.  For the "means for enabling," SPEX failed to compare the structure of the corresponding "conventional computer bus 615" to the accused products.  SPEX's expert compared instead a dictionary definition of "conventional," obviating this limitation entirely as SPEX's expert admitted he could not identify anything that he would not consider to be a conventional computer bus.  For the "security means," SPEX's expert offered no infringement opinion on the actual encryption algorithm—XTS AES—used in all but one of Apricorn's accused products.  Finally, for the "target means enabling a defined interaction with a host computing device," SPEX presented only the USB "get

descriptor command" and response as the "defined interaction."  But this fails as matter of law because it is undisputed that the storage, the alleged "target means," does not enable or participate in this incompatible USB communication that occurs entirely between the host and CPU.  Apricorn should be granted JMOL of noninfringement or, alternatively, a new trial.

## II.    BACKGROUND

The '802 patent expired in June 2017.  At trial, SPEX argued for infringement of certain Apricorn secure data storage drives (collectively the "Accused Devices" or "Accused Products") sold from 2010 to 2017.  Ex. 3 (2/4 Tr.) at 39:23-40:7 (identifying the Accused Products).  For purposes of evaluating infringement, the Accused Products fall into two categories: the Aegis Secure Key Flash Drive using a third-party chip referred to as the 1861 chip and the remaining Accused Products using another third-party chip referred to as the 3607 chip.  *Id.* at 50:5-21.  PX22 depicts a logical block of the 3607 chip while PX11 depicts a logical block of the 1861 chip.  *Id.* at 43:23-25, 46:14-20, 49:23-50:4, 150:17-20; Ex. 9 (PX11); Ex. 10 (PX22).  In a general verdict form, the jury found infringement of claims 11 and 12 of the '802 patent, without specifying whether that infringement was literal or by the DoE.  Dkt. 287 at 2.  Before the verdict, Apricorn timely filed a Rule 50(a) motion for JMOL of noninfringement.  Dkt. 269.

## III.    LEGAL STANDARD

On a JMOL motion, "the court may … remove 'issue[s]'—claims, defenses, or entire cases—from the jury when there is no 'legally sufficient evidentiary basis' to support a particular outcome."  *Summers v. Delta Air Lines, Inc.*, 508 F.3d 923, 926 (9th Cir. 2007) (citation omitted); Fed. R. Civ. P. 50.  A JMOL motion "is not a patent-law-specific issue, so regional circuit law applies."  *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1248 (Fed. Cir. 2005).  "[M]otions for a new trial" are also "reviewed under the law of the regional circuit."  *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1338 (Fed. Cir. 2014).  If a verdict is contrary to

the great weight of the evidence, a new trial may be granted.  *Murphy v. Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990).  "An erroneous instruction regarding claim interpretation that affects the jury's decision on infringement is grounds for a new trial."  *Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1373 (Fed. Cir. 2002).

## IV.     NO LEGALLY SUFFICIENT EVIDENCE THAT THE ACCUSED PRODUCTS INCLUDE THE "MEANS FOR MEDIATING"

This Court construed the "means for mediating" limitation of claim 11 as subject to § 112(6) with a recited function of "mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means." Ex. 1 (1/30 Tr.) at 132:22-133:4; Ex. 6 (2/7 Tr.) at 15:16-23.  The Court identified the corresponding structure as "interface control device 910, as shown in Fig. 9B" ("ICD 910").  *Id.*  In the structure of ICD 910, "communicated data" between the host and target means is confined to a hardwired pathway—with no exits or alternatives—directly through the "cryptographic processor interface" to the "security means."

Apricorn does not infringe this limitation for two independent reasons—the Accused Products neither (1) perform the claimed function, nor (2) have the same or an equivalent structure to ICD 910.  The Accused Products do not perform the function because some of the "communicated data" in the Accused Products— control data—does not "pass through the security means."  It is undisputed that the communicated control data in the Accused Products fails to "pass through the security means" as literally required by the "means for mediating."  Even if the "control data" did not need to "pass through the security means," SPEX still failed to provide the jury with a legally sufficient basis to conclude that the Accused Products contain the same or equivalent structure as ICD 910.  Unlike the "in-line" (hardwired) structure of ICD 910 shown in Figure 9B, the Accused Products use a dramatically different "way" to "mediate" the movement of communicated data and SPEX proffered no evidence that these differences are "insubstantial."

Unlike the "in line" flow of data depicted in Figure 4 of the '802 patent, the communicated data in the Accused Products travels back through what SPEX identifies as the "host interface" *after* the data passes through the alleged "security means."  To mediate this flow of data, the Accused Products use CPU-controlled routing rather than the "in-line," hardwired connections used by ICD 910.  SPEX's infringement evidence simply ignored the substantially different ways the ICD 910 and Accused Products ensure that data pass through the "security means" and is deficient as a matter of law.



'802 Patent, Fig. 4

Accused Products

Finally, SPEX cannot argue infringement based on § 112(6) equivalents for the structures used in the Accused Products because it failed to show they existed at the time of the invention.  SPEX is also legally barred by prosecution history estoppel ("PHE") from asserting infringement under the DoE.  Further, the expansion of the scope of the "means for mediating" under the DoE to encompass the Accused Products would improperly vitiate the "means for mediating" limitation.  JMOL should be granted to Apricorn that the Accused Products do not include the "means for mediating."

### A.    There Was No Legally Sufficient Evidence That The Accused Products Perform The Function Of The "Means For Mediating"

To prove that the Accused Products include a § 112(6) limitation, SPEX was first required to show that the accused structure performs the identical function required by the "means for mediating."  *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1333 (Fed. Cir. 2006).  There was no legally sufficient evidence

that the Accused Products perform this "mediating" function.

The function of the "means for mediating" requires "that the communicated data must first pass through the security means." The Accused Products do not perform this function because, as SPEX's expert admitted, "control" and "configuration data" does not pass through the security means in the Accused Products. Ex. 3 (2/4 Tr.) at 195:6-13; Ex. 5 (2/6 Tr.) at 169:23-170:21, 172:18-173:13 (control data does not pass through security in the accused products); *see also* Ex. 4 (2/5 Tr.) at 50:23-51:18.[1] As the record confirms, "control" is "control data." *Id.* at 197:11-198:11 (security standard at issue refers to "control data"), 198:16-199:24 (USB specification refers to "control data"); Ex. 4 (2/5 Tr.) at 18:2-8 (SPEX's expert's own patent uses term "control data"); Ex. 14 (PX154); Ex. 11 (PX70). Unable to overcome this, SPEX tried to re-write the claims to exclude "control data" from the "communicated data" that must be mediated. Ex. 4 (2/5 Tr.) at 34:19-42:14, 50:4-51:18, 231:4-22; Ex. 6 (2/7 Tr.) at 52:5-9, 115:14-17. There is no legal basis to exclude "control data" from the scope of the "communicated data" in claim 11. Indeed, when SPEX tried to belatedly raise this new claim construction at trial, this Court characterized it as not "accurate." Ex. 1 (1/30 Tr.) at 199:22-200:9 ("If you are suggesting that control data doesn't have to follow that path, I don't think that's accurate.").

SPEX's only purported justification for its construction is the "strawman" argument that the requirement for the "control data" to "pass through the security means" would result in the control data being encrypted and the system being rendered inoperable. Ex. 4 (2/5 Tr.) at 37:2-11; *see also* Ex. 2 (1/31 Tr.) at 216:11-217:18. This argument fails for several reasons. First, the "security means" function is only "enabling one or more security operations to be performed on data." "Enabling" does not require all "data" that may pass through the "security

---

[1] Testimony by Larry Ko was presented by deposition. Ex. 4 (2/5 Tr.) at 52-53.

means" to be subject to a security operation. Nor does it require encryption, rather than some other security operation such as authentication. Ex. 1 (1/30 Tr.) at 131:11-23; Ex. 6 (2/7 Tr.) at 14:4-18; *see also* Ex. 5 (2/6 Tr.) at 154:13-18.[2]

Second, SPEX's inoperability "strawman" is inconsistent with the corresponding embodiment in the '802 patent. Both parties' experts agreed that the "control" in ICD 910 passes through the "crypto processor interface," but would not be encrypted. Ex. 4 (2/5 Tr.) at 49:17-20, 50:19-22; Ex. 5 (2/6 Tr.) at 150:3-154:18. Indeed, one exemplary "security means" in the patent, a MYK-82 chip, includes both a cryptographic processor for applying encryption to certain data and an ARM processor core for processing without encryption other data such as control data or address data. Ex. 7 (PX1) at 15:63-16:9; Ex. 1 (1/30 Tr.) at 131:17-23; Ex. 6 (2/7 Tr.) at 14:4-18; Ex. 5 (2/6 Tr.) at 151:25-152:21, 152:22-153:13 (processor in the specification includes components not for encryption).

Rather than hinder operation, the trial record uniformly confirmed that passing control data through the security means was needed to ensure the operability of ICD 910. An inventor and Apricorn's expert each testified that control data must pass through the cryptoprocessor interface in Figure 9B to "keep it all synchronized" and properly process the data. Ex. 2 (1/31 Tr.) at 220:14-221:1; 221:19-222:2 (control "must pass through the cryptoprocessor interface" as part of "associated logic to keep it going"); Ex. 4 (2/5 Tr.) at 50:19-22 (admitting that in Figure 9B "the control information must pass through the cryptoprocessor interface"); Ex. 5 (2/6 Tr.) at 151:25-153:24 (control and address data "need to be carried along," so that they can show where that information [for encryption] goes"

---

[2] Although Apricorn does not agree with the Court's limitation of the term "data" in the "security means" to refer to "user data," this construction does effectively acknowledge that not all data passing through the security means must be encrypted. As noted above, this narrowing instruction was unnecessary because the "security means" limitation does not say all data must be encrypted.

1  is to correct memory location); 144:18-145:3 (same).

2        Undeterred by the Court's rejection and contrary to the intrinsic and extrinsic

3  evidence, SPEX improperly offered (over Apricorn's objection) the claim

4  constructions of an inventor and its expert who testified that "control data" is not

5  "communicated data" in the "means for mediating." *See, e.g.,* Ex. 2 (1/31 Tr.) at

6  219:16-22; Ex. 4 (2/5 Tr.) at 36:13-37:1.  But it was the Court's role to interpret the

7  claims, not SPEX's trial witnesses.  In any event, as explained above, there was no

8  legally sufficient evidence to exclude "control data" from the "communicated data"

9  that must pass through the security means according to the "means for mediating."

10  Since it is undisputed that the control data in the Accused Products never passes

11  through the security means, there is no legally sufficient evidence upon which a

12  jury could rely to find that the Accused Products literally infringe.  *Applied Med.*

13  *Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006).

14        Nor is there any legally sufficient evidence for infringement under the DoE.

15  SPEX never presented a case for infringement under the DoE in which

16  "communicated data" includes "control data" that must pass through the security

17  means, as SPEX's expert wrongly based his entire analysis on the assumption that

18  control data is not data.  *See, e.g.,* Ex. 4 (2/5 Tr.) at 36:2-37:11.

19              **1.    PHE Precludes Applying The DoE To the "Means for**

20                      **Mediating" Limitation**

21        PHE may be addressed "on a motion for judgment as a matter of law at the

22  close of the evidence and after the jury verdict."  *Warner-Jenkinson Co., Inc. v.*

23  *Hilton Davis Chemical Co.*, 520 U.S. 17, 39 n.8 (1997).  There is a presumption

24  that a narrowing claim amendment made for reasons of patentability surrenders all

25  subject matter "between the original claim and the amended claim."  *See Festo*

26  *Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740 (2002).

27        Apricorn is entitled to JMOL that SPEX is precluded by PHE from asserting

28  infringement under the DoE for the "means for mediating" limitation of claim 11.

During prosecution, in response to the Examiner's rejection of original claim 1 under 35 U.S.C. § 103, the applicant cancelled original claim 1 and rewrote original dependent claim 6, that added the "means for mediating" limitation, in independent form.  Ex. 18 at SPEX00000326, 332-335.[3]  The applicant acknowledged the "means for mediating" in rewritten original claim 6 (that issued as claim 1) was the "basis for allowability" and overcame obviousness in view of the cited prior art: U.S. Patent No. 5,770,849 to Novis et al. ("Novis").  *Id.* at SPEX00000335.

Rewriting a claim in this manner qualifies as a narrowing amendment that is subject to the *Festo* presumption.  *See Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1140-42 (Fed. Cir. 2005) (*en banc*).  PHE from that amendment applies not only to issued claim 1, but to all claims with that same limitation, including asserted claim 11.  *See Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1314-15 (Fed. Cir. 2006) ("The amendment to claim 1 applies with equal force to the scope of claim 9, which contains the same limitation."); *Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 1182-84 (Fed. Cir. 2009) ("The presumption of surrender applies to all claims containing the added limitation, regardless of whether the claim was, or was not, amended during prosecution.") (quotation and citation omitted).  To overcome this presumption, the patentee bears the burden of demonstrating the equivalent would have been "unforeseeable at the time of the amendment" or "bear[s] no more than a tangential relation to the equivalent in question."  *See Festo*, 535 U.S. at 740-41.  SPEX cannot meet this burden here.

The '802 patent itself confirms that the particular equivalent in question was foreseeable.  The specification acknowledges that it was known in the prior art that mediation between a host and target means may "fail[] to first transfer data to the

---

[3] Further discussion of this portion of the file history may be found in the parties' joint claim construction statement.  *See* Dkt. 44 at 120, 133, 151, 167.

security device for appropriate treatment before providing the data to the portable device."  Ex. 7 (PX1) at 2:64-67; *id*. at Figs. 1, 2 (depicting "prior art" designs where communicated data did not first pass through security mechanism).  Thus, it was foreseeable an alleged equivalent may fail to transfer all the communicated data through the security means.  *See Duramed Pharma., Inc. v. Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011) ("An alternative is foreseeable if it is disclosed in the pertinent prior art in the field of the invention.") (quotation and citation omitted); *L.B. Plastics, Inc. v. Amerimax Home Prods., Inc.*, 499 F.3d 1303, 1309 (Fed. Cir. 2007) (when the specification "criticizes [] prior art alternatives, the patentee cannot then use the doctrine of equivalents to capture those alternatives").

The tangential exception to the *Festo* presumption is "very narrow" and does not apply here.  *Integrated Tech. Corp. v. Rudolph Techs.*, Inc., 734 F.3d 1352, 1358 (Fed. Cir. 2013) (citation omitted).  As noted above, Spyrus relied upon the "means for mediating" to distinguish the Novis prior art during prosecution.  Ex. 18 at SPEX00000335.  Like the Accused Products, Novis lacked a hardwired connection requiring that "the communicated data must first pass through the security means," that the Examiner had identified as security circuit 86.  *Id*. at SPEX00000319-320. Like the Accused Products, the data between the "host database 96" and the "target means" or "smart card interface 82" is mediated by CPU 75 controlling the movement of the data, without requiring data to first pass through this security circuit 86.  Ex. 17 (Novis) at 3:53-55 (CPU 75 "serves as the heart of the system"); Ex. 18 at SPEX00000317-318.  Both Novis, reproduced with colored notations below on the left, and the Accused Products, as annotated in SPEX's expert Mr. Gomez' trial demonstratives, use CPU-controlled mediation and lack a hardwired path through the alleged security means:

| **Novis** | **Accused Products** |
|---|---|



SPEX cannot meet its burden to show that the amendment during prosecution was "clearly tangential" to the alleged equivalent at issue here and PHE applies as a matter of law to preclude infringement under the DoE.  *See Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed. Cir. 2003).

> **2.      Applying DoE To The Accused Products Would Vitiate The Required Function Of The "Means For Mediating"**

The DoE is also barred as a matter of law in this case because expanding the scope of claim 11 by equivalents to encompass the Accused Products would entirely vitiate the "means for mediating" limitation's requirement that "communicated data must first pass through the security means."  *See, e.g., Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562 (Fed. Cir. 1994).  As noted above, SPEX's expert admitted that some of the communicated data not only fails to "***first* pass** through the security means," but ***never* passes** through the alleged "security means."  Ex. 3 (2/4 Tr.) at 195:6-13. This is the opposite of the function required by the "means for mediating," that a named inventor testified improved over the prior art by forcing all data through the security means, eliminating the possibility of any "leaks" in the transfer.  Ex. 2 (1/31 Tr.) at 185:17-186:2.  Because SPEX's "theory of equivalence would entirely vitiate" the required function of the "means for mediating," "judgment should be rendered by the court" in Apricorn's favor.  *Warner-Jenkinson,*

520 U.S. at 39 n.8.  Moreover, as is further described *infra* in the next section, ICD 910 passively connects compatible technologies through hardwiring, which is the opposite of the CPU translation between incompatible technologies in the accused products, and thus applying the DoE would vitiate the "means for mediating."  *Id.*

## B.  There Was No Legally Sufficient Evidence That The Accused Products Include ICD 910 Or An Equivalent

Regardless whether the Accused Products perform the claimed function, SPEX failed to present legally sufficient evidence the Accused Products include a structure that performs this claimed function in "substantially the same way" to show equivalents under either § 112(6) or the DoE.  *See, e.g. Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1364-65 (Fed. Cir. 2000) ("a structure failing the section 112, paragraph 6 test under either or both prongs must fail the doctrine of equivalents test for the same reason(s)").

Claim 11 requires the "means for mediating" have a structure that ensures "that the communicated data must first pass through the security means."  To accomplish this, the patent says that "security operations are performed in-line, *i.e.*, the security operations are performed between the communication of data to or from the host computing device and the performance of the target functionality provided by the peripheral device."  Ex. 7 (PX1) at 6:2-7; Ex. 2 (1/31 Tr.) at 185:17-186:2 (inventor Sutherland testifying their design "would always make sure that the data was routed and never leaked"), 186:3-7 ("we could trust the paths because they couldn't be modified by an outside attack"); Ex. 3 (2/4 Tr.) at 26:1-7, 34:2-8 (SPEX's expert testifying that the '802 patent purportedly solved prior art problems with "in line" security and prevents circumvention), 33:4-34:1 ("inline security" is a benefit of the '802 patent), 181:23-183:10 (components in ICD 910 are conventional but "the specific arrangement" of the components is not).

1   　　　The Court identified ICD 910 as the corresponding structure for the "means

2   for mediating."  The "way" ICD 910 first passes the data through the security

3   means is a physical connection forming a hardwired "in-line" pathway (with no

4   alternative route) from the host interface through the "crypto processor interface" of

5   security means and then to the target interface for the storage.  In ICD 910, the only

6   "way" for data to reach the target means is to follow this hardwired path directly

7   through the security means, as depicted by SPEX's expert at trial:



17   　　　There was no dispute that the Accused Products lacked the hardwired "in-

18   line" structure of ICD 910.  Ex. 5 (2/6 Tr.) at 179:12-180:10; Ex. 9 (PX11); Ex. 10

19   (PX22).  The Accused Products do not have a single pathway for data that requires

20   all of the data moving from the host to the storage to flow through a hardwired

21   connection directly to the security means.  In ICD 910, the PCMCIA interface

22   connects to Crypto Processor Interface, but it does not connect to the Compact

23   Flash Interface.  However, the Accused Products have a USB block ("Data Buffer")

24   for the host interface that does connect directly to the storage ("SATA Digital").

25   The flow of data in the Accused Products is different than in ICD 910 because, after

26   data passes through the alleged security means ("AES"), data must pass back

27   through the "Data Buffer" which SPEX has identified as part of the "host interface"

28   (Ex. 3 (2/4 Tr.) at 109:8-110:9, 114:21-15, 126:2-16):



This different structure with a different data flow operates in an entirely different way.  It was undisputed that data in the Accused Products did not pass through the encryption circuitry because of a hardwired connection as in ICD 910, but because the CPU was programmed to mediate movement of the data to do so. Ex. 5 (2/6 Tr.) at 168:4-17; Ex. 9 (PX11); Ex. 10 (PX22).  There was no dispute that the CPU mediates the flow of data between the host and storage, as was described by Apricorn's expert.  Ex. 5 (2/6 Tr.) at 161:14-162:1, 163:22-168:23, 175:25-176:9, 177:14-181:1.  This CPU controls movement of data from a USB 3.0 interface with the host computer to a "configurable data buffer."  *Id*. at 168:4-17. The CPU then selectively moves certain data within the configurable data buffer to and from the encryption engine.  *Id*.  Finally, the CPU moves this encrypted data into the storage.  *Id*. at 161:14-162:1, 168:4-17.  Unlike the hardwired structure of ICD 910, data in the Accused Products would go directly from host to storage if the programming were changed intentionally or by an "attack."  *Cf*. Ex. 2 (1/31 Tr.) at 186:3-7 (Sutherland: "we knew we could trust the paths because they couldn't be modified by an outside attack"); Ex. 3 (2/4 Tr.) at 34:2-8 (SPEX's expert testifying that there is no security circumvention in '802 patent), 24:21-26:7 (prior art "[s]oftware is inherently vulnerable" and patent solved that with "in line" security mechanism), 33:4-34:1 ("[h]ardware is inherently less vulnerable to hackers").

As SPEX's expert never even mentioned the CPU in his infringement testimony (Ex. 3 (2/4 Tr.) at 103:25-134:23), SPEX offered no evidence to show that CPU control in the Accused Products operates in substantially the same way as the simple hardwired connection of ICD 910.  Nor could SPEX do so.  The unrebutted evidence at trial showed that the CPU-managed mediation of data in the Accused Products operates in a substantially different way than the hardwired "in-line" mediation depicted in ICD 910.  Ex. 5 (2/6 Tr.) at 183:18-185:2, 161:21-162:1, 164:6-168:23, 170:12-21, 175:21-176:9, 177:14-181:1 ("sophisticated CPU" and "configurable data buffer" used for mediation in the accused products), 183:18-185:2, 228:9-229:9.  Despite its prominence in performing the accused function of managing the movement of data in the Accused Products, SPEX's infringement theory was that the CPU was not part of the alleged "means for mediating" or equivalent to the hardwired connection of ICD 910.  Ex. 3 (2/4 Tr.) at 174:8-17, 175:12-176:16.  Instead, SPEX merely argued that "[n]o data will be written to the memory module without being encrypted first" and "that is language that parallels the claim element." *Id*. at 124:5-10; *see also id.* at 105:25-106:8.  This only paraphrases the function, failing as a matter of law to show that the "way" the alleged function is performed by the Accused Products is substantially the same.

By ignoring the essential role played by the hardwired connection in ICD 910 to ensure data first passes through the security means and the very different CPU-based structure in the Accused Products, SPEX failed to carry its burden on infringement.  *See Toro Co. v. Deere & Co.,* 355 F.3d 1313, 1324 (Fed. Cir. 2004) (absence of "indispensable" component is "appropriate[ly]" considered as part of the structural equivalence analysis given its "central role"); *Solomon Techs., Inc. v. Int'l Trade Comm'n*, 524 F.3d 1310, 1317 (Fed. Cir. 2008) ("greater weight to be given to individual components that play a central role in the identified structure").  Indeed, SPEX relied upon this hardwired connection in the "means for mediating" to secure allowance.  Unlike this hardwired connection in ICD 910, the CPU of the

Accused Products manages the communication of data between the accused structures identified by SPEX as alleged equivalents to ICD 910.  Ex. 3 (2/4 Tr.) at 177:15-179:3 (SPEX's expert conceding that Accused Products are "configured by the CPU so that it would perform the correct functions.")  The hardwired connection in ICD 910 was thus part of the necessary structure for allegedly mediating communicated data and SPEX failed to carry its burden by ignoring it.  *See Toro,* 355 F.3d at 1324; *Solomon Techs.*, 524 F.3d at 1317.

In any event, a reasonable jury could not conclude the Accused Products' use of CPU-controlled mediation is insubstantially different from the hardwired ICD 910.  The CPU cannot be disregarded; the Accused Products would not mediate any communicated data without direction from the CPU.  Ex. 5 (2/6 Tr.) at 178:16-179:11; 181:11-182:19 (SPEX's identification of structures was arbitrary).  Without the CPU to translate between the incompatible technologies of the host's USB interface and the storage's SATA and NAND interfaces, the Accused Products would not operate.  *Id.* at 145:12-150:2, 179:12-181:1; *see also* Ex. 4 (2/5 Tr.) at 23:5-24, 27:7-15.  No such translation is needed in ICD 910 because it was only designed to handle PCMCIA and Compact Flash that can communicate directly without any active translation.  *Id.*  By ignoring the essential CPU, SPEX failed to present legally sufficient evidence that the Accused Products perform the function in an equivalent "way" to the structure of ICD 910.  *Unidynamics Corp. v. Automatic Products Intern., Ltd.*, 157 F.3d 1311, 1322 (Fed. Cir. 1998); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1345-46 (Fed. Cir. 2016).[4]

### 1. Literal infringement is precluded as a matter of law because the alleged equivalents are after-arising technology.

The "means for mediating" literally covers only corresponding structure

---

[4] SPEX also improperly ignored the role of the configurable data buffer in the Accused Products.  Ex. 5 (2/6 Tr.) at 166:18-167:2, 167:22-168:17, 180:11-181:1.

disclosed in the patent and equivalents thereto. As a matter of law, a limitation governed by § 112(6) can only be literally infringed by an "equivalent" structure that was available as of the '802 patent's issuance date (July 11, 2000). *See Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 (Fed. Cir. 1999). Thus, as the Court instructed the jury, "SPEX has the burden to prove the allegedly 'equivalent' structure on Apricorn's product was available as of July 11, 2000." Ex. 6 (2/7 Tr.) at 19:6-12; *see also* Ex. 1 (1/30 Tr.) at 160:21-161:1.

For the "means for mediating," SPEX accused portions of the 3607 and 1861 chips. Ex. 3 (2/4 Tr.) at 109:25-110:3, 114:21-23, 115:8-116:1, 128:8-11, 129:11-14, 129:21-24, 131:17-21, 131:22-132:12 (accusing portions of the 3607 and 1861 chips). But SPEX's expert did not know and did not offer testimony on when these third-party 3607 and 1861 chips were first available and instead pointed to the data sheets for the chips. *Id*. at 150:21-151:21. These data sheets are dated well after the issuance date of the '802 patent. *Id.* at 43:23-25 (PX22: 3607 chip data sheet dated April 27, 2011), 46:14-20 (PX11: 1861 chip data sheet dated October 22, 2010). In any event, the technology incorporated into these chips—such as SATA 2.5, NAND Flash, USB 3.0, and XTS AES structures—did not become available until well after the '802 patent issued as admitted by SPEX's expert. *Id.* at 152:2-6 (USB 3.0 introduced in 2006 or 2007), 152:12-19 (SATA 2.5 introduced in mid-2000s), 153:10-22 (SATA 1.0 introduced in August 2001), 153:23-154:13 (NAND Flash introduced in December 2006), 158:8-9, 159:23-160:1, 163:13-23 (XTS AES introduced after July 11, 2000).[5] With no evidence in the record that the accused structures were available when the patent issued, Apricorn is entitled to JMOL of no literal infringement under § 112(6).

---

[5] The admitted trial exhibits confirmed that these are after-arising technologies. Ex. 3 (2/4 Tr.) at 64:4-65:2 (PX96: XTS AES), 83:11-84:3 (PX601: SATA 2.5), 84:11-21 (PX593: NAND Flash), 94:23-95:2 (PX83: USB 3.0).

### 2. SPEX's component-by-component analysis failed to show an overall equivalent to ICD 910.

As the Court instructed the jury, "the claim limitation is the overall structure corresponding to the claimed function. Further deconstruction or parsing is incorrect." Ex. 6 (2/7 Tr.) at 18:25-19:3, 20:8-11. Contrary to the Court's instruction, SPEX compared individual components of ICD 910 to components of the 3607 and 1861 chips in the Accused Products.[6] Ex. 3 (2/4 Tr.) at 125:17-126:22, 127:15-132:12; Ex. 4 (2/5 Tr.) at 45:11-46:20. Any "overall structure" analysis presented to the jury by SPEX was entirely conclusory, focusing on purely functional language of moving data between three interfaces outside of ICD 910 without any acknowledgement of the importance of the structure inside ICD 910. Ex. 3 (2/4 Tr.) at 35:3-12 ("the important thing about the ICD 910 is that it's a three-way interface"), 104:12-25 ("ICD 910, it's essentially a three-way interface device"), 105:14-106:8 ("This is a three-way device, so it has three interfaces. But the internal direction of the data, the internal control of the data, always will ensure that the data is encrypted before it can be stored."); *see also id.* at 129:25-132:12.

That was insufficient. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1317 (Fed. Cir. 2012) ("purely functional language, which simply restates the function" "is insufficient to provide the required corresponding structure"). By presenting nothing more than a three-way interface as the "overall structure," SPEX did not apply the Court's construction requiring ICD 910 or an equivalent structure. ICD 910 is the collection of structures within the dotted line show in Fig. 9B, not a generic three-way interface. Dkt. 142 at 13.

---

[6] The Court had already noted this failing in the opinions expressed in Mr. Gomez's report. Dkt. 228 at 10-11("Apricorn is correct that Gomez conducts a granular, 'component-by-component' analysis in his expert report" and "Gomez will be limited to presenting only opinions at trial that were appropriately disclosed during expert discovery in this case.").

SPEX's improper component-by-component analysis further failed to properly address the specific structures depicted in ICD 910 that mediate the data, such as PCMCIA, Compact Flash, "DATA" line, and "LOCAL DATA" line structures.  Ex. 3 (2/4 Tr.) at 184:7-189:2, 190:16-193:9, 129:11-14, 131:17-21, 179:4-15, 180:6-9.  The Accused Products use none of these technologies depicted in ICD 910.  *Id.*; *see also* Ex. 5 (2/6 Tr.) at 205:22-206:7 and Section IV.B, *supra*. Also among the components in ICD 910 are the configuration registers labeled as 911.  *Id.* at 193:22-194:15 ("mediating will slow [*sic*, allow] the security to say enable or disable and would go through the security means").  On direct, SPEX's expert did not address the configuration registers.  But on cross-examination SPEX's expert conceded that they are not present in the Accused Products.  Ex. 3 (2/4 Tr.) at 191:8-14, 192:21-193:9.[7]  Given that the patent describes the configuration registers as determining "whether data passing through the peripheral device must be subjected to security operations" ('802 patent at col. 17:24-36), and is indispensable to the functioning of ICD 910, SPEX failed to carry its burden to account for them.  *See Toro,* 355 F.3d at 1324; *Solomon Techs.*, 524 F.3d at 1317.

Rather than provide evidence of how the technologies in ICD 910 from before June 1997 perform the recited function in "substantially the same way" as the later-arising technologies used in the Accused Products, SPEX improperly invited the jury to simply disregard any structural differences.  *Id*. at 105:1-24 ("Q. Now, in the interface control device 910, this example uses PCMICA and Compact Flash.  Was the interface control device limited to these interfaces? A. No. … [The inventors] said in the patent that there are other interfaces that could replace the ones that they've defined.").  But the '802 patent "does not disclose alternatives to

---

[7] While this motion is based on the Court's claim construction ruling as it stands (Dkt. 62 at 37), Apricorn reserves the right to argue on appeal that claim 11 is indefinite because the specification does not provide sufficient disclosure for ICD 910's configuration registers.  Dkt. 47 at 16-17; Dkt. 51 at 11-12.

[ICD 910], such as, for example, a general class of known" mediating structures, and thus SPEX's argument ignored that the inventors disclosed "[no] more than the specific circuit shown" in Figure 9B.  *Bennett Marine, Inc. v. Lenco Marine, Inc.*, 549 Fed. App'x 947, 954-55 (Fed. Cir. 2013).  SPEX's application of equivalents would vitiate the structure of ICD 910 altogether.  *Conopco*, 46 F.3d at 1562.

### 3.  There was no legally sufficient evidence of an equivalent structure because of "intermingling" of components.

SPEX's theories "effectively obviate[d] the 'means for mediating' limitation as construed altogether."  Dkt. 142 at 12-13.  The Court noted in denying Apricorn summary judgment that "intermingling of smaller elements of the means for mediating and security means, such that there is no clear and distinct overall structure for each claim limitation, would lead to an issue similar to the one warranting noninfringement for WD."  *Id.* at 19.  SPEX did precisely that at trial.

On cross-examination, SPEX's expert admitted that there is "intermingling between components" of the AES encryption engine (the alleged "security means") among the other components identified by SPEX as corresponding to the ICD 910 (the alleged "means for mediating").  *See, e.g.,* Ex. 3 (2/4 Tr.) at 173:11-16 (" Q. … do you know if the AES encryption engine is physically spread out over the 3607 chip? A. Typically there is some amount of **intermingling** between components because transistors need to be placed optimally. But other than that, that's all I can say about it.") (emphasis added); *see also id.* at 172:24-173:1 ("Q. Do you know where the AES engine is physically located in the Initio 3607 chip? A. No, I don't.").  Indeed, each of the 3607 chip and the 1861 chip in the Accused Products is a system on a chip.  *Id.* at 150:8-10 ("Q. Are the Initio chips in Apricorn's accused products **systems on a chip**? A. You could consider them to be that.'") (emphasis added); *Id*. at 150:11-16, 180:6-9; *see also* Ex. 5 (2/6 Tr.) at 162:9-12; 181:11-182:19.  SPEX never explained to the jury where the components in the Accused Products that allegedly correspond to the "means for mediating" and to the

"security means" were located in the chips or how they were physically arranged relative to one another.  *Id.* at 43:23-25, 46:14-20, 150:17-20, 171:25-172:5, 172:17-174:16.  Nor did SPEX identify any alleged interface for the alleged security means (the "AES engine") sitting "smack in the middle" of what it otherwise identifies as the "means for mediating" structure in the 3607 and 1861 chips.  *Id.* at 50:6-15, 52:16-54:16, 109:8-110:3, 113:13-19, 114:21-115:15, 116:2-9, 125:17-128:22, 127:15-128:16 (identifying host interface and storage interface but no clear and distinct security "interface"), 169:1-172:8 (identifying interface pins for host interface and storage interface but no such interface for the AES engine because it is "internal" to the chip); *see also* Ex. 5 (2/6 Tr.) at 229:20-22 (no evidence for an AES interface).  SPEX admitted these components are intermingled, and thus failed to present legally sufficient evidence of any clear and distinct overall structure identified as meeting this claim limitation.  Dkt. 142 at 19.

## V.    NO LEGALLY SUFFICIENT EVIDENCE OF A "MEANS FOR ENABLING COMMUNICATION BETWEEN THE SECURITY MEANS AND THE TARGET MEANS"

This Court construed this "means for enabling" to have a corresponding structure of "conventional computer bus 615" shown in Figure 6.  Ex. 6 (2/7 Tr.) at 15:2-6; *see also* Ex. 1 (1/30 Tr.) at 132:15-19.  Figure 6 depicts a peripheral device with internal devices that "communicate with each other via a conventional computer bus 615."  Ex. 7 (PX1) at 6:40-45, Fig. 6; Ex. 5 (2/6 Tr.) at 187:7-188:5 (conventional computer bus 615 allows communication among multiple devices).  There was no legally sufficient evidence that the Accused Products include the conventional computer bus 615 or its equivalent under § 112(6) or the DoE.[8]

SPEX's expert mentioned the Court's construction, but never compared

---

[8] SPEX accused SATA and NAND Flash.  Ex. 3 (2/4 Tr.) at 85:1-9, 88:5-12.  As explained in regards to the "means for mediating," these are after-arising and cannot literally infringe.

1   conventional computer bus 615 to the Accused Products as part of his infringement

2   analysis.  Ex. 3 (2/4 Tr.) at 81:18-82:4; *see also* Ex. 4 (2/5 Tr.) at 20:22-22:10

3   (SPEX's expert conceding he referred to ICD 910, not conventional computer bus

4   615).  Instead of comparing "conventional computer bus 615" in Figure 6 to the

5   Accused Products, SPEX's expert relied on a dictionary definition of

6   "conventional" to present a legally flawed infringement analysis based on what he

7   considered would be a "conventional" computer bus today.  Ex. 3 (2/4 Tr.) at 82:12-

8   83:4.  This is legal error.  To evaluate infringement under § 112(6) law, SPEX's

9   expert should have compared the "conventional computer bus 615" as disclosed in

10  the patent in 1997—not a dictionary definition of "conventional"—to the Accused

11  Products.  Indeed, this erroneous analysis effectively read this limitation out of the

12  claim because SPEX's expert essentially admitted that he would consider any bus

13  to be "conventional."  Ex. 4 (2/5 Tr.) 28:20-23 (SPEX's expert unable to identify

14  any computer bus that he would not consider a conventional computer bus).

15         SPEX's expert then compounded his legal error by testifying that accused

16  after-arising technologies are examples of a "conventional" computer bus structure

17  within the literal scope of § 112(6) for the "means for enabling."  Ex. 3 (2/4 Tr.) at

18  83:11-84:25 (SATA 2.5 and NAND Flash).  These after-arising technologies did not

19  exist and were not "conventional" at the time that the application for the '802 patent

20  was filed in 1997 and, thus, could not have been disclosed in the '802 patent as

21  corresponding structures.  Indeed, the SATA 2.5 specification (PX601) is dated

22  October 27, 2005 and the Open NAND specification (PX593) is dated December

23  28, 2006—years after the '802 patent issued.  *Id.* at 152:12-19, 153:23-154:13; Ex.

24  16 (PX601); Ex. 15 (PX593).  Thus, SPEX failed to present legally sufficient

25  evidence that the Accused Products have the same or an equivalent structure.

26         Only Apricorn's expert compared conventional computer bus 615 to the

27  Accused Products and he testified that the accused SATA structure in the 3607 chips

28  was substantially different from conventional computer bus 615 because, among

other reasons, it does not connect to multiple devices as shown in Figure 6 in the '802 patent.  *See, e.g.,* Ex. 5 (2/6 Tr.) at 186:22-188:5; 188:25-189:8; 191:15-23. Moreover, SPEX's expert did not even attempt to present infringement testimony under the DoE for the Accused Products which include NAND Flash in the 1861 chips.  Ex. 3 (2/4 Tr.) at 91:17-92:23.  JMOL should be granted for Apricorn that the Accused Products do not include this "means for enabling."

## VI.   NO LEGALLY SUFFICIENT EVIDENCE THE ACCUSED PRODUCTS WITH 3607 CHIPS INCLUDE A "SECURITY MEANS"

As the Court instructed the jury, the corresponding structure for the "security means" is "a specific hardware component programmed or configured to perform a security operation disclosed in the '802 patent at 18:1-47[.]"  Ex. 1 (1/30 Tr.) at 131:18-132:5; Ex. 6 (2/7 Tr.) at 14:4-18.  SPEX failed to present legally sufficient evidence that the Accused Products with the 3607 chip include this "security means" under § 112(6) or under the DoE.[9]  As SPEX's expert agreed, the 3607 chips in the Accused Products use XTS AES encryption.  Ex. 3 (2/4 Tr.) at 155:7-12, 163:13-23, 167:12-14; Ex. 13 (PX96).  But SPEX's expert conceded that he "did not give an opinion on XTS AES" compared to any corresponding structure in the Court's construction.  *Id.* at 157:15-17 ("I gave an opinion on AES, not XTS."); *see also* Ex. 5 (2/6 Tr.) at 216:6-10.[10]  SPEX cannot overcome its failure to compare XTS AES to one of the security operations in the '802 patent simply because it can be categorized as a form of "symmetric encryption."  Ex. 3 (2/4 Tr.) at 59:25-60:5,

---

[9] For the "security means," SPEX accused portions of the 3607 chip utilizing XTS AES.  Tr. (2/4) at 64:4-65:2; Ex. 13 (PX96).  As explained above in reference to the "means for mediating," XTS AES is after-arising and cannot literally infringe.
[10] SPEX's expert made a cursory comparison of DES encryption to AES encryption but that is legally insufficient to establish infringement of XTS AES.  Ex. 3 (2/4 Tr.) at 69:9-70:50, 164:21-23; *see also* Ex. 5 (2/6 Tr.) at 196:9-18, 225:17-226:7. SPEX's expert conceded that there are substantial differences between XTS AES and AES.  Ex. 3 (2/4 Tr.) at 161:9-162:21.

60:20-61:1, 166:13-167:3.  Just as explained above with regard to the "conventional computer bus 615," the '802 patent can only disclose security operations that existed at the time of the '802 patent.  The patent's reference to a "symmetric encryption algorithm" cannot be read as disclosing every "symmetric encryption algorithm" that might be developed no matter how different from those known at the time of the patent.  JMOL should be granted that the Accused Products with the 3607 chips do not include a "security means."

## VII.   NO LEGALLY SUFFICIENT EVIDENCE THAT THE ACCUSED PRODUCTS INCLUDE A "TARGET MEANS"

As the Court instructed the jury, the "'target means for enabling a defined interaction with a host computing device' has a recited function of 'enabling a defined interaction with a host computing device,' and corresponding structures of '1. a memory module adapted to enable nonvolatile storage of data[.]'"  Ex. 6 (2/7 Tr.) at 14:19-15:1.  The Court further instructed the jury that "'Defined interaction' means 'an interaction (with a host computing device) that can provide one or more of a variety of functionalities.'"  Ex. 6 (2/7 Tr.) at 132:6-14.  At trial, SPEX identified the non-volatile SATA and NAND storage in the Accused Products as the "target means."  Ex. 3 (2/4 Tr.) at 72:19-75:10.  SPEX identified the standard USB "get descriptor command" request sent from the host and the response from "the peripheral device [that] will say what it is," such as a "mass storage device," as the "defined interaction."  *Id.* at 77:8-78:9, 80:6-18.  SPEX did not identify anything else as qualifying as a "defined interaction."

This fails as a matter of law because it was undisputed that the storage in the Accused Products does not respond to the USB "get descriptor command."  Rather, as Apricorn's expert explained, the USB standard used to communicate with the host is "not compatible" with the storage used in the Accused Products.  Ex. 5 (2/6 Tr.) at 195:8-23, 196:3-6, 215:5-19.  It is undisputed that the documentary evidence states that USB and the storage in the Accused Products are "disassociated" from

1   one another.  *Id.* at 167:22-168:17; Ex. 8 (PX8) at 34; *see also* Ex. 4 (2/5 Tr.) at

2   26:13-16.  So, rather than the storage responding to the USB "get descriptor

3   command," SPEX's expert agreed that "the CPU controls the identification of the

4   Apricorn product as a USB mass storage device."  Ex. 3 (2/4 Tr.) at 180:10-14.

5       There was no legally sufficient evidence that the alleged "target means" (the

6   storage) in the Accused Products enables the accused "defined interaction" (the

7   response to the USB "get descriptor command").  SPEX did not present a DoE

8   theory (Ex. 3 (2/4 Tr.) at 80:6-18),[11] and doing so would improperly vitiate this

9   limitation.  *See, e.g., Conopco*, 46 F.3d at 1562; *Warner-Jenkinson,* 520 U.S. at 39

10  n.8.  Apricorn should be granted JMOL that the Accused Products do not include a

11  "target means for enabling a defined interaction with a host computing device."

12  **VIII.  THE COURT SHOULD GRANT A NEW TRIAL**

13      Alternatively, should the Court determine that judgment of noninfringement

14  cannot be entered in Apricorn's favor, Apricorn respectfully requests that the Court

15  grant a new trial under Rule 59.  First, for at least all of the reasons explained above

16  in support of Apricorn's motion for JMOL of no infringement, the great weight of

17  the evidence presented at trial went against the jury's verdict of infringement.

18  Thus, the Court should grant a new trial on infringement.  *See Georgia-Pacific*

19  *Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1333 (Fed. Cir. 1999), *opinion amended*

20  *on reh'g*, 204 F.3d 1359 (Fed. Cir. 2000).

21      Second, the Court should grant a new trial on infringement because of an

22  "erroneous instruction regarding claim interpretation that affect[ed] the jury's

23  decision on infringement."  *Ecolab*, 285 F.3d at 1373.  During trial, a dispute arose

24  between the parties regarding whether the phrase "communicated data" in the

25  "means for mediating" of claim 11 included "control data."  *See, e.g.*, Ex. 1 (1/30

26

27  ─────────────────
28  [11] SPEX relied on SATA and NAND Flash, which, as discussed in reference to the "means for mediating," are after-arising technology that cannot literally infringe.

1  Tr.) at 200:8-10 (the Court inviting the parties to file trial briefs).  Both SPEX and

2  Apricorn took the position that the existing construction of "means for mediating,"

3  without further construction of the term "communicated data," was sufficiently

4  clear.  Dkt. 249 at 1; Dkt. 251 at 4.

5       Notwithstanding this agreement, the Court *sua sponte* further construed

6  related language in a different limitation, the "security means."  Over Apricorn's

7  objection, the Court issues an amended construction that "[w]ith respect to the

8  security operation, 'data' refers to user data, not control data or address data"

9  without clarifying that "communicated data" in the "means for mediating" does

10  include both "control data and address data."  Ex. 6 (2/7 Tr.) at 14:16-18; *id*. at 7:7-

11  20.  Without Apricorn's requested clarification, the jury was without clear

12  instruction on how to interpret "communicated data," to the prejudice of Apricorn.

13  *See, e.g., Avago Technologies General IP PTE Ltd. v. Elan Microelectronics Corp*.,

14  No. C 04-05385 JW, 2009 WL 8612367, *2-*4 (N.D. Cal. Sept. 23, 2009) (granting

15  a new trial because the court's mid-trial modifications to its claim construction

16  deprived the parties of fair opportunity to present their case).  SPEX's counsel

17  exploited this uncertainty during closing to try to confuse the jury into believing the

18  Court had adopted the construction of "communicated data" that the Court had

19  actually rejected.  Ex. 6 (2/7 Tr.) at 52:5-9 ("This is in your jury instructions, ladies

20  and gentlemen: With respect to the security operation, data refers to user data, not

21  control, not address.  Okay.  Just like we've been telling you consistently, the only

22  thing that needs to be mediated is the data."), 115:14-17 ("The Court clarified that

23  with respect to security operation, data refers to user data and not control data.

24  Claims have to be construed consistently.").  As such, a new trial should be granted.

25   Dated:  May 4, 2020                                    Respectfully submitted,

26

27      /s/ Michael J. Lyons
        Christopher D. Bright
28      christopher.bright@morganlewis.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MORGAN, LEWIS & BOCKIUS LLP
600 Anton Boulevard, Ste. 1800
Costa Mesa, CA 92626
Tel: 714.830.0600
Fax: 714.830.0700

Hersh Mehta (*admitted pro hac vice*)
hersh.mehta@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
Tel: 312.324.1739
Fax: 312.324.1001

Michael J. Lyons
michael.lyons@morganlewis.com
Carla B. Oakley
carla.oakley@morganlewis.com
Ahren C. Hsu-Hoffman
ahren.hsu-hoffman@morganlewis.com
Ehsun Forghany
ehsun.forghany@morganlewis.com
Thomas Y. Nolan
thomas.nolan@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1400 Page Mill Road
Palo Alto, CA 94304
Telephone:   650.843.7226
Facsimile:    650.843.4001

Attorneys for Defendant,
Apricorn

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on May 4, 2020, I electronically filed the foregoing

3   document **DEFENDANT APRICORN'S MEMORANDUM OF POINTS AND**

4   **AUTHORITIES IN SUPPORT OF ITS RENEWED MOTION UNDER RULE**

5   **50(b) FOR JUDGMENT AS A MATTER OF LAW OF NO INFRINGEMENT**

6   **AND ALTERNATIVELY FOR A NEW TRIAL UNDER RULE 59** with the

7   Clerk of the Court for the United States District Court for the Central District of

8   California by using the CM/ECF system, which constitutes service on all counsel of

9   record to this action.

10      Executed on May 4, 2020, at Palo Alto, California.

11

12                              /s/ Michael J. Lyons

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28